Usha VAKHARIA, M.D., Plaintiff,

v.

SWEDISH COVENANT HOSPITAL,
et al., Defendants.

No. 90 C 6548.

United States District Court,
N.D. Illinois, E.D.

March 30, 1993.

Memorandum Granting Reconsideration
in Part June 10, 1993.

Allen E. Shoenberger, Chicago, IL, for plaintiff.

Laurence H. Lenz, Jr., Laura Ruth Keidan, Keith A. Dorman, J. Stuart Garbutt, Paul A. Haskins, Katten, Muchin & Zavis, Douglas Wm. Godfrey, Chicago, IL, for defendants.

Paul Gutermann, Bradley H. Blower, Squire, Sanders & Dempsey, Washington, DC, for American Soc. of Anesthesiologists.

### MEMORANDUM AND ORDER

MORAN, Chief Judge.

Dr. Usha Vakharia (Vakharia), a woman in her mid-forties, was born in Bombay, India and served for one and-a-half decades as an anesthesiologist on the medical staff of the Swedish Covenant Hospital (Hospital) in Chicago. She brings this suit against the Hospital, the American Society of Anesthesiologists (ASA), thirty-nine individual doctors affiliated with the Hospital or the ASA, and other "unnamed members" of the Hospital's Board of Directors. According to Vakharia, beginning in 1987 the Hospital assigned her fewer and less desirable cases and, on July 31, 1989, after several of the defendants gave her negative performance evaluations, the Hospital formally suspended her from its medical staff. She alleges that, at some time or another, and in some way or another, each of the named defendants discriminated against her on the basis of color, race, gender, age, and national origin, in violation of federal antidiscrimination laws, and that each of them endeavored to remove her from the Hospital staff in order to reduce economic competition among anesthesiologists, in violation of federal antitrust laws. She also claims that the Hospital terminated her staff privileges in violation of the its own bylaws, thereby violating Illinois law as well.

On May 22, 1991, we denied the Hospital's motion to dismiss Vakharia's complaint, although we did dismiss the claims against the individual members of the Hospital's Executive Committee. *Vakharia v. Swedish Covenant Hospital,* 765 F.Supp. 461 (N.D.Ill. 1991). Since then Vakharia has twice amended her complaint, adding new defendants and new claims against defendants previously named.

Plaintiff was originally represented by counsel. Later on she ceased to be so represented. That was a matter of some concern to this court because the original pleading, in a one-plaintiff discrimination case, named sixteen defendants in a lengthy five-count complaint, and because the litigation promised (and has proved to be) highly contentious. We were relieved, therefore, when plaintiff engaged new counsel. And it has been mostly downhill ever since.

The two amendments substantially increase the scope of one of the prior counts and have added three more counts and numerous new defendants. The complaint is now 50 pages long. The added counts recite a great number of alleged facts and conclusions, but without much regard for the legal concepts they supposedly support. The defendants have moved to dismiss the amendments—close to another 140 pages of briefs have been filed—and, with these rulings, perhaps we will finally, after well more than two years of litigation, end the pleading wars and proceed to the merits of the controversy.

The outlines of the controversy emerge from the initial allegations of the original complaint. Plaintiff contends that Dr. Nancy Loeber, the chairperson of the Department of Anesthesiology, from sometime in the late 1980s, embarked on an effort to force out three female Asian foreign-born anesthesiologists, one of whom was plaintiff. To that end she began to assign them fewer and less desirable cases, singled out plaintiff for criticism, and thereafter created two classes of anesthesiologists within the department, with the three Asian females being members of the lower or "junior" of the two classes. Thereafter plaintiff was allowed to handle only a limited number of relatively simple types of procedures. In 1989 Dr. Loeber began using Certified Registered Nurse Anesthetists (CRNA), but only the "seniors" could use them, resulting in a further restriction of the practice of the "juniors." In 1988 plaintiff was passed over for the position of vice-chairperson and was, for a time, unofficially suspended. When plaintiff asked to resume practicing at the hospital, Dr. Loeber

made it difficult for that to happen. When plaintiff complained in 1989, she was refused a hearing, rejected once again as vice-chair-person, subjected to discriminatory review by an ASA panel and, on June 30, 1989, suspended. Failure to provide a hearing led to a state court lawsuit, and a hearing was thereafter convened. But that hearing was also discriminatory. Plaintiff, in December 1989, was denied renewal of staff privileges for 1990; in May 1990 the peer review committee recommended a permanent suspension, and the Hospital Board of Directors affirmed the findings and recommendations on September 14, 1990. The original complaint ascribed as reasons for those actions the plaintiff's color, race, national origin, sex and age. The original complaint alleged claims pursuant to Title VII, § 1981, ADEA and a state law claim based on breach of contract and violation of the medical staff bylaws. The Hospital, the subject of the original EEOC charge, was named as a defendant in all four counts. Dr. Loeber was named as a defendant in the § 1981 claim. The members of the Hospital Executive Committee were added as defendants to the state law claim. On May 20, 1991, this court denied motions to dismiss the Title VII and ADEA claims. We pared down the § 1981 claim on the basis of then applicable law and dismissed the individual defendants as unnecessary to the relief claimed.

In the amendments plaintiff brings back the Executive Committee defendants in count IV, broadening the relief claimed by asking for injunctive relief on the ground that those doctors may seek to wrong her in the future. In the first new count, count V, plaintiff alleges § 1981 and § 1985(3) claims against all defendants, who include ASA, the ASA panel and the Hospital's Executive Committee, Credentials Committee, Joint Conference Committee of the Medical Staff, the Board of Directors, an *ad hoc* hearing committee, and the Appellate Review Committee of the Board of Directors. In the second new count, count VI, she alleges that all the defendants violated the Sherman Act by engaging in a conspiracy in restraint of trade and a conspiracy to monopolize, and an attempt to monopolize the delivery of anesthesia services at the Hospital, including a boycott of the "juniors." In the last new claim, count VII, all the individual defendants and ASA are added into a new Title VII claim. Defendants have moved to dismiss the amendments.

## DISCUSSION

### The Addition of Parties Not Named in the First Complaint

Vakharia filed her first complaint in this case on November 16, 1990. In that complaint she named 16 defendants: the Hospital, Dr. Loeber, and 14 individual members of the Hospital's medical staff Executive Committee. In her first amended complaint, filed on July 15, 1992, Vakharia named 24 additional defendants, all doctors who had worked with her or had evaluated her performance. Finally, in her second amended complaint, filed on September 18, 1992, she added another defendant, the American Society of Anesthesiologists, several officers of which had been named in the first amended complaint. Unfortunately for Vakharia, several of the causes of action she alleges were time-barred against most of the additional defendants by the time she named them.

In Title VII and ADEA cases the plaintiff must file suit in federal court no later than 90 days after the Equal Employment Opportunity Commission (EEOC) has given notice of the plaintiff's right to sue. 42 U.S.C. § 2000e–5(f)(1) (Title VII); 29 U.S.C. § 626(e) (ADEA). *See St. Louis v. Alverno College,* 744 F.2d 1314 (7th Cir.1984). That requirement is not satisfied by any of the claims against the defendants that Vakharia named for the first time in the amended complaints. The question then is whether the amendments "relate back" to the initial complaint, which everyone agrees was filed in timely fashion.

Under Fed.R.Civ.P. 15(c) an amendment adding a party to a complaint relates back to the date of the original complaint only if the party to be brought in by amendment has received notice of the action, will not be prejudiced by the amendment, and "knew or should have known that, but for a mistake concerning the identity of the proper

party, the action would have been brought against the party." Vakharia has not alleged any mistakes concerning the identity of any defendants. To be sure, many of the added defendants may have been aware of Vakharia's lawsuit when it was filed, and many may have recognized themselves as participants in some of the events that her first complaint described, but that does not mean that the 1992 claims against them relate back to the first complaint. *See Wood v. Worachek*, 618 F.2d 1225 (7th Cir.1980). When Vakharia filed her suit the defendants whom she would later name had no reason to believe that she intended to sue them. Vakharia knew who they were and where to find them. Accordingly, the Title VII claims against the defendants named for the first time in the 1992 amended complaints do not relate back to the first complaint. *See Norton v. International Harvester Co.*, 627 F.2d 18, 20–22 (7th Cir. 1980); *Havoco of America, Ltd. v. Hilco, Inc.*, 750 F.Supp. 946, 953 (N.D.Ill.1990), *aff'd*, 971 F.2d 1332 (7th Cir.1992). Those claims are dismissed.

■■ Unlike Title VII and the ADEA, § 1981 and § 1985 do not specify limitations periods. *See* 42 U.S.C. § 1981, 42 U.S.C. § 1985. As a result, federal courts interpreting them have looked to state law to apply the statute of limitations applicable to comparable state law claims. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). In Illinois, the statute of limitations applicable both to § 1981 and § 1985 cases is two years. *Smith v. City of Chicago Heights*, 951 F.2d 834, 836–7 n. 1 (7th Cir.1992); *Kness v. Grimm*, 761 F.Supp. 513, 519 (N.D.Ill.1990). As noted, when Vakharia first filed her lawsuit the defendants whom she would later add had no reason to believe that they were, or would be, part of the suit. Therefore, no § 1981 or § 1985 claim can survive against a defendant named for the first time in the first or second amended complaint unless the complaint points to an act committed by that defendant occurring after July 15, 1990 (exactly two years prior to the filing of the amended complaint). Except for certain decisions made by the Hospital's Board of Directors in September 1990, all of the acts at issue in this case occurred prior to July 15, 1990.

Thus, the § 1981 and § 1985 claims against the members of the Board of Directors are not time-barred, but all other § 1981 and § 1985 claims against defendants not named in the first complaint are time-barred and are dismissed.

■ In her amended complaint, Vakharia has also listed "unnamed" members of the Board of Directors as defendants. They have never been named and never been served. It is too late to do so now. Thus, those "unnamed" defendants are dismissed.

### Title VII Claims Against Remaining Defendants

In this court's memorandum and order of May 22, 1991, we denied the Hospital's motion to dismiss Vakharia's Title VII claim against it. The defendants other than the Hospital, observing that Vakharia failed to name any of them as defendants in her EEOC complaint, now seek dismissal of the Title VII claims against them.

■ If a party has not been named in a complaint with the EEOC, that party generally may not be sued under Title VII. *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124 (7th Cir.1989). In *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A.*, 657 F.2d 890, 905 (7th Cir.1981), *cert. den.* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982), however, the Seventh Circuit established an exception to that rule, permitting a claim to proceed under Title VII against a defendant who had not been named in a prior EEOC complaint, because the defendant had received adequate notice of the charge and had been given the opportunity to participate in conciliation proceedings. "[C]harges are to be construed with 'utmost liberality' and parties sufficiently named or alluded to in the factual statement are to be joined." *Id.* at 906. Here Vakharia's Title VII claims against several of the defendants other than the Hospital fall into the *Eggleston* exception. Although her EEOC complaint did not list Dr. Loeber or the Executive Committee doctors as defendants, it did allude to them in the factual description of the charge and implied that

they had participated in the Hospital's allegedly discriminatory scheme.

In allowing a plaintiff to proceed against a defendant who had not been named in an EEOC complaint, *Eggleston* emphasized that the unnamed defendant had been able to participate informally in the EEOC conciliation proceedings. The conciliation process had been less than optimal, especially from the point of view of the unnamed defendant, but, as the court noted, conciliation is not an inalienable right of Title VII defendants. *Id.* at 907. Sometimes a defendant's right to full participation in conciliation must give way to the plaintiff's right to sue the appropriate parties. "Congress could not have intended that a person filing EEOC charges should accurately ascertain, at the risk of later facing dismissal, at the time the charges were made, every separate entity which may have violated Title VII." *Id.* at 906. *See also Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir.1970) (stating that "the specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow").

In this case Vakharia received her right-to-sue letter before she and the Hospital could enter into the conciliation process. We therefore need not reach the issue of whether the interests of the unnamed defendants were represented adequately during the EEOC proceedings. Since nothing of significance happened while the case was before the EEOC, the unnamed defendants could not have been prejudiced by Vakharia's failure to name them. Accordingly, the procedural arguments raised by the remaining defendants other than the Hospital do not persuade us to dismiss the Title VII claims against them.

■ The defendants who were not named in the EEOC complaint also argue that, even if the Title VII claims against them are not procedurally barred, they should be dismissed because Vakharia has failed to allege that they bore discriminatory motives when they acted against her. That criticism is premature. Although there is little in Vakharia's complaint to suggest that certain of the defendants intentionally discriminated against her, Vakharia was not required to recount every single arguably relevant incident in her complaint. Complaints are supposed to be "short and plain," Fed.R.Civ.P. 8(a) (and this complaint is far too long already), and unless special matters such as fraud are alleged, *see* Fed.R.Civ.P. 9, particularities need not be pleaded. At the summary judgment stage claims against specific defendants may be dismissed if Vakharia fails to support them with specific evidence of culpability. *See* Fed.R.Civ.P. 56. We will address those issues at a later date.

### Section 1981 Claims Against Remaining Defendants

We observed in our May 22, 1991 memorandum and order that, under then-applicable law, § 1981 prohibited discrimination in the formation and enforcement of contracts but not in the performance and termination of contracts. *See Patterson v. McClean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Because Vakharia's contract to serve on the Hospital's medical staff already had been formed when the Hospital's alleged discrimination commenced, we ruled that the Hospital's refusal to retain her on its medical staff was not cognizable under § 1981. In ruling as we did, we did not dismiss all of Vakharia's § 1981 claim. Distinguishing between her contract with the Hospital, which had been formed prior to the Hospital's allegedly discriminatory acts, and her potential contracts with new patients, which had not been formed at the time of the acts at issue, we held that Vakharia could proceed on her § 1981 claim as it related to contracts with patients.

■ Several months after we issued our order Congress enacted the Civil Rights Act of 1991, which amended § 1981 to allow suits for discrimination in the performance and termination, as well as the formation and enforcement of contracts. The 1991 amendments do not alter our earlier thinking on Vakharia's § 1981 claim. Following the Seventh Circuit's holdings in *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225 (1992), *pet. for cert. filed*, 61 U.S.L.W. 3446 (1992), and *Mozee v. American Commercial Marine Service Co.*, 963 F.2d 929 (1992), *cert. den.* — U.S. —, 113 S.Ct. 207, 121

L.Ed.2d 148 (1992), we cannot allow plaintiff to proceed on that claim as it pertains to her contract to serve on the Hospital's medical staff. We recognize that the Supreme Court has granted *certiorari* on the retroactivity issue and that this circuit will be revisiting, *en banc,* that issue in *Mojica v. Gannett Co., Inc.,* 986 F.2d 1158 (7th Cir.1993). Until we are directed otherwise, however, we must follow what we believe is the law in this circuit, and we believe that the law here is that the 1991 amendments have no retroactive effect on conduct prior to their passage.

■ Plaintiff contends that she should be allowed to proceed on the portion of her claim relating to her contract to serve on the medical staff because, despite the enactment of the Civil Rights Act of 1991, the Hospital has continued to abide by its allegedly discriminatory decision not to renew that contract. We think her argument muddles the distinction between acts and the harm that acts can cause. Vakharia may have felt the impact of the Hospital's allegedly discriminatory acts well after the effective date of the 1991 amendments, but that does not mean that the 1991 amendments apply to those acts. The question, according to the court in *Luddington,* is whether § 1981 prohibited the defendants' acts when they were committed. 966 F.2d at 229. Under *Patterson,* § 1981 did not prohibit the Hospital's acts when they were committed, at least not as they pertained to the medical staff contract between Vakharia and the Hospital. The Hospital stood by its decision even after the 1991 amendments went into effect, but we cannot see its maintaining of the status quo as a distinct discriminatory act to which the amendments would apply.

■ Vakharia marshals a second reason to allow her to go forward on her § 1981 claim as it relates to her contractual relationship with the Hospital. She contends in her second amended complaint that, in addition to seeking a continuation of her medical staff privileges, she also sought appointment as chairperson of the Department of Anesthesiology after Dr. Loeber resigned from that post. According to Dr. Vakharia, the chairperson has significant supervisory responsibilities beyond those of regular members of the medical staff, and Hospital bylaws would have entitled her to that position had she been a member in good standing of the staff. With those new allegations, her case becomes not merely a discriminatory discharge case but a discriminatory refusal-to-promote case. Under *Patterson,* § 1981 encompassed suits for the discriminatory denial of promotions when the "nature of the change in position was such that" it offered "an opportunity for a new and distinct relation between the employee and the employer." 491 U.S. at 185, 109 S.Ct. at 2377. The portion of her claim against the Hospital relating to the Hospital's refusal to promote her to the chairperson post is therefore cognizable under § 1981.

Defendants assert that just as Vakharia should be disallowed from naming new defendants, so should she be disallowed from alleging new facts or legal theories on which to base her claims. They complain that she failed to mention in her initial complaint important facts about the final months at the Hospital, such as her application for the chairperson post, and that those details emerged only when she amended her complaint, more than two years after the incidents at issue occurred. Fed.R.Civ.P. 15(c) is not as strict as defendants would have it. Because defendants had fair notice prior to the expiration of the statute of limitations of the claims against them and the general transactions and occurrences on which those claims are based, Fed.R.Civ.P. 15(c) permits relation back of the amendments to the complaint that add facts or modify legal theories, even though those amendments were filed after the statute of limitations period had expired. *See Donnelly v. Yellow Freight System, Inc.,* 874 F.2d 402, 410 (7th Cir. 1989), *aff'd on other grounds,* 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990). *See also Moore's Federal Practice,* ¶ 15.15[3.–2]. We would note that in this case Vakharia did not even allege a new cause of action, as the plaintiff did in *Donnelly.* She may proceed on her § 1981 claim against all of the remaining defendants on the old theory relating to her potential contracts with patients, and she may proceed on her § 1981 claim against all of the defendants named in the first com-

plaint on the new theory relating to her potential elevation to the chairperson's position. Because the acts relating the denial of Vakharia's application for the chairperson's position occurred before July 15, 1990, the defendants on the Board of Directors who were named for the first time in the amended complaints may not be held liable on the second theory.

*Section 1985 Claims Against Remaining Defendants*

The Supreme Court laid out the requirements for a claim under § 1985(3) in *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971):

> To come within the legislation a complaint must allege that the defendants did (1) "conspire . . ." (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." It must then assert that one or more of the conspirators (3) did, or caused to be done, "any act in furtherance of the object of [the] conspiracy," whereby another was (4a) "injured in his person or property" or (4b) "deprived of having and exercising any right or privilege of a citizen of the United States."

■ Section 1985(3) does not create any substantive rights. As the Supreme Court explained in *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979), "it merely provides a remedy for violation of the rights it designates."

■ A plaintiff suing under § 1985 must point to rights or privileges afforded to citizens under some federal law and must allege that the defendants conspired to deny the plaintiff those rights. Conspiracy to deny a right guaranteed under state law is not enough. Thus, in *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (*Carpenters* ), the Supreme Court held that the plaintiffs had not made out a cause of action under § 1985(3) when they alleged that they had been beaten by the defendants after protest-

ing certain labor practices. The Court explained that the defendants, who were all private citizens, did not endeavor to deprive the plaintiffs of their First Amendment rights when they beat the plaintiffs, because the First Amendment protects individual speakers against censorship by the government, not by other individual citizens. State laws may prohibit violent censorship by private citizens, but the First Amendment does not.

In this case Vakharia purports to base her § 1985(3) claim on rights that she says are secured by three federal statutes: Title VI; the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd; and § 1981. We conclude that Vakharia is not within the range of persons protected by either Title VI or the EMTALA, and that her § 1985(3) claim cannot by supported by either of those statutes. On the other hand, as explained, we do believe that § 1981 protects persons like Vakharia from the kinds of harms she claims the defendants intended, and that a § 1985 claim can be based on a conspiracy (even an unsuccessful one) to violate § 1981.

■ To assess Vakharia's attempt to make out a § 1985 claim based on a conspiracy to violate Title VI, we turn to the caselaw interpreting Title VI. The Seventh Circuit held in *Doe on Behalf of Doe v. St. Joseph's Hosp. of Fort Wayne,* 788 F.2d 411, 418 (1986) (*Doe* ), that a doctor who had served on the medical staff of a hospital receiving federal funds could not state a claim under Title VI based on discriminatory termination of her staff privileges. Here, as in *Doe,* the defendant hospital received federal funds, but, as in *Doe,* there is no claim that hospital staff members were the intended beneficiaries of those funds. Here the hospital received federal funds through participation in the federal Medicare and Medicaid programs. Medicare and Medicaid funds are allocated for the purpose of providing medical care, and while the doctors who perform the medical services receive a benefit from those programs, the intended beneficiaries are the patients, not the doctors. Because doctors at hospitals receiving federal funds are not protected in such circumstances by

Title VI, *Doe* at 420–21, Title VI cannot support Vakharia's claim under § 1985(3). *See also Vuciecevic v. MacNeal Memorial Hosp.*, 572 F.Supp. 1424, 1429–30 (N.D.Ill. 1983). The Fifth Circuit gives plaintiff comfort in *United States v. Harris Methodist Ft. Worth*, 970 F.2d 94 (5th Cir.1992), but that court does not recognize a physician as a Title VII employee. We also do not believe that plaintiff can avoid the *Doe* conclusion by claiming to act as a representative of patients.

Dr. Vakharia's attempt to plead a § 1985(3) action through EMTALA is also unavailing. Although doctors who report violations of the Act are protected against retaliation by the Act's own terms, 42 U.S.C. § 1395dd(i), Vakharia never alleges that she reported instances of "patient dumping" to anyone (other than this court). She fails to indicate how her presence on the medical staff reduced patient dumping, or how her termination increased it. She has not alleged that any of the defendants sought to deny her any of the rights that she was given under EMTALA. We fail to glean any intention to permit physicians to invoke patient rights in the rather carefully sculpted remedial provisions of 42 U.S.C. § 1395dd, and we fail to see any legally cognizable class-based animus in any event.

Her attempt to plead a § 1985(3) action through § 1981 is more successful. Defendants do not dispute the general proposition that a § 1985(3) claim can be supported by a conspiracy to deny a person rights secured by § 1981. They argue simply that Vakharia was not protected by § 1981 because her contract with the Hospital already existed at the time the alleged discrimination began. But that argument already has been rejected, and a limited § 1981 claim remains. Thus, the only issue remaining is whether, as defendants contend, Vakharia has failed to plead sufficient facts to support the conspiracy element of § 1985(3).

*Conspiracy Under § 1985 and the Sherman Act*

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), spawned the doctrine that there cannot be an "intra-enterprise" conspiracy under the antitrust laws. Plaintiff claims here a conspiracy to monopolize, to restrain trade, to discriminate against her, and to violate § 1985. We assume, for the purposes of ruling upon a motion to dismiss, that the allegations are based on a belief, after reasonable inquiry, that they are well grounded in fact. Thus we assume, for now, that the Hospital, ASA and all 39 doctors consciously committed themselves to a scheme to discriminate against plaintiff because she is an Asian foreign-born woman, and for the purpose of restraining competition in anesthesiological services at the Hospital.

Plaintiff contends that the *Copperweld* doctrine does not apply to the § 1985 claims because they are civil rights claims and, with respect to all claims, because she alleges multiple acts and because the various defendants have separable interests and acted contrary to the interests of the Hospital. Civil rights claims such as these may be treated differently from antitrust claims in some jurisdictions, but not in this circuit. Two decades ago the Seventh Circuit held in an opinion by Judge (now Justice) Stevens that a discriminatory business decision reflecting "the collective judgment of two or more executives of the same firm" cannot satisfy the conspiracy element of § 1985(3). *Dombrowski v. Dowling*, 459 F.2d 190, 196 (1972). A business cannot conspire with itself. That was reemphasized in *Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108 (7th Cir.1990). Rejecting the notion that multiple acts negate the doctrine, the *Travis* court went on to resolve doubts against an increased ambit of § 1985 when, as here, other federal civil rights remedies are available. "Intra-corporate dealings under § 1985 therefore should receive the same treatment as intra-corporate dealings under the Sherman Act...." *Id.* at 110.

What then is the appropriate treatment under the Sherman Act? Judge Aspen, in *Pudlo v. Adamski*, 789 F.Supp. 247 (N.D.Ill.1992), reviewed a number of the per-

tinent cases and concluded that members of a medical staff are capable of conspiring among themselves but that the Hospital cannot be a conspirator. We agree in part. Members of the staff may have any number of interests somewhat different from those of the Hospital, but that is true of corporate officers generally who have individual interests in their careers, their advancement and their compensation. The Sherman Act, section 1, proscribes agreements that unreasonably restrain trade. We believe that plaintiff must prove that defendants acted out of personal economic interest in restraining competition. Here plaintiff alleges that defendants Loeber, Chookaszian, Myent and Konowitz were anesthesiologists who benefitted by the restriction and then termination of plaintiff's practice. The claim is one of horizontal competitor collaboration. *See Bolt v. Halifax Hospital Medical Center,* 891 F.2d 810 (11th Cir.1990), *cert. denied,* 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990). The Hospital allegedly knowingly acquiesced in the efforts to get rid of plaintiff and it made the final decisions. We cannot infer that it did not act in its own perceived best interests. Perhaps the ASA defendants should be covered by the doctrine because they were not competitors and acted, in a vertical relationship, as agents at the behest of the Hospital. *See Travis,* 921 F.2d at 111. The ASA is, however, a separate enterprise and the reviewing doctors were associated with ASA, not the Hospital. In fact, the ASA doctors were retained to perform *independent* review. We leave them, for now, as defendants capable of conspiring. We do not, however, view the allegations as disclosing personal economic stakes of the other doctors, distinct from the Hospital's, or as describing centers of separate social or economic influence sufficient to cause the other doctors to be capable of conspiring with the Hospital.

Although the ASA, the ASA doctors, and Drs. Myent and Konowitz are theoretically capable of being named as co-conspirators, they were not named in the original complaint. The § 1985 claims against them are barred by the applicable statute of limitations. Of the defendants who can be regarded as co-conspirators, only the Hospital and defendants Loeber and Chookaszian were named in the original complaint. Therefore, only they are proper § 1985 defendants.

*Antitrust Claims Against Remaining Defendants*

Antitrust claims based upon restrictions or termination of staff privileges have been particularly troubling to the courts. On the one hand antitrust claims escalate the stakes and multiply the expense in what may be frivolous claims regarding loss of status by one physician at one hospital. On the other hand, termination of staff privileges, necessarily disclosed to any subsequent hospital to which a physician has applied for staff privileges, can seriously hinder or prevent any future staff relationship.

Here plaintiff alleges that defendants violated section 1 of the Sherman Act by conspiring in restraint of trade, and section 2 by conspiring to monopolize and attempting to monopolize the provision of anesthesiologist services at the hospital. To prove a violation of either section, a plaintiff must show more than efforts by the defendants to prevent the plaintiff from obtaining a specific job or contract. The plaintiff must allege that the defendants sought to reduce competition in, or monopolize, an entire market. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (interpreting § 1); *Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (interpreting § 2). A claim by an anesthesiologist that she was kept out of one hospital, when there are several hospitals in the area, ordinarily is not enough. *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 480 n. 5 (7th Cir.1988), *cert. den.* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *Ezpeleta v. Sisters of Mercy Health Corp.,* 800 F.2d 119, 121–22 (7th Cir.1986), *implied overruling on other grounds recognized by Lim v. Central DuPage Hosp.,* 972 F.2d 758, 761 (7th Cir.1992); *Dos Santos v. Columbus–Cuneo–Cabrini Medical Center,* 684 F.2d 1346, 1353 (7th Cir.1982). We think restraint of trade and monopolization claims based upon the hospital as the relevant market cannot survive. The restraint of trade claim, however, extends to a broader market. Plaintiff claims

that she was foreclosed from entering and continuing in the market at other hospitals in the Chicago area and that the reported termination of privileges has caused her to be effectively unemployable. The ASA defendants contend that plaintiff has not alleged a sufficient nexus to interstate commerce, a jurisdictional predicate. We disagree. The pleadings are not much dissimilar from those in *Summit Health, Ltd. v. Pinhas,* —— U.S. ——, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). Moreover, *Summit Health* was not confined to an exposition of the niceties of pleading jurisdiction. The Court made it clear that it considered a conspiracy to restrain competition that resulted in an exclusion of a doctor from practice in the Los Angeles area as running afoul of section 1 of the Sherman Act, and the dissent so recognized. Here defendants argue that the termination of Vakharia affected only the doctors at Swedish Covenant Hospital, and not the relevant market as a whole, but the *Summit* Court rejected such analysis.

That result is not dissimilar from many other cases in which the courts have dealt with antitrust attacks on peer review decisions on the merits, most recently in *Manion v. Evans,* 986 F.2d 1036 (6th Cir.1993). Congress, by passage of the Health Care Quality Improvement Act (HCQIA). 42 U.S.C. § 11101 *et seq.,* implicitly recognized the reach of the antitrust acts to peer review decisions and immunized only limited exceptions. The ASA defendants rely upon the HCQIA in their motion to dismiss, but the short answer is that plaintiff has alleged, on various grounds, that the ASA defendants are not within the immunity provided by that statute. *See Summit Health, Ltd. v. Pinhas,* —— U.S. at —— fn. 12, 111 S.Ct. at 1848 fn. 12. We conclude that plaintiff can proceed with her section 1 claim based upon her termination of privileges against the hospital, the ASA, and Drs. Vacanti, Blancato, Wender, Loeber, Chookaszian, Myent, and Konowitz.

Although our decision permits Vakharia to proceed with her claim under section 1, we do not think it particularly helpful to talk about a "group boycott" as a means for defining a result. Terminating privileges is not necessarily anticompetitive. Hospitals compete with each other, and the quality of medical care and lower prices resulting from lower malpractice premiums are means of competition. A commitment to quality health care may well, even in the absence of economic considerations, provide a limited justification for exclusionary decisions. *See Wilk v. American Medical Association,* 719 F.2d 207 (7th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2398, 2399, 81 L.Ed.2d 355 (1984). We leave to another day the question of whether the decision to exclude Vakharia can be so justified.

*State Law Claims Against Remaining Defendants Concerning Violation of the Hospital's Bylaws*

In count IV Vakharia contends that the Hospital failed to follow its bylaws when it evaluated and dismissed her. In this court's order of May 22, 1991, we dismissed the claims contained in count IV against the individual members of the Executive Committee. We agree with defendants that count IV, despite plaintiff's amendment to it, still does not implicate those defendants. With the amendment plaintiff seeks "declaratory judgment and injunctive relief" against all of the defendants named, including the defendants who previously had won dismissal with respect to count IV. The additional language has almost no meaning, however, in the context of a claim concerning the failure to follow institutional bylaws. Beyond reinstatement of the plaintiff and expungement of certain documents from her personnel file, there is no other remedy for the Hospital's alleged conduct and, as we already have held, neither reinstatement nor expungement of records requires participation of the Executive Committee. Once again we dismiss the claims contained in count IV against the individual members of the Executive Committee.

## CONCLUSION

All Title VII claims against all defendants named for the first time in the first or second amended complaints [1] are dismissed.

1. The defendants named for the first time in the first or second amended complaints are: B. Adri-

All § 1981 claims against all defendants named for the first time in the first or second amended complaints are dismissed, except for certain of the claims against named members of the Board of Directors. The § 1981 claims against members of the Board of Directors named for the first time in the amended complaints may proceed, but only with respect to their alleged efforts to deny Vakharia the ability to form contracts with patients.

All § 1985 claims against all defendants are dismissed, except for the § 1985 claims against the Hospital, Loeber and Chookaszian. The § 1985 claims based on alleged conspiracies to violate Title VI and the EMTALA also are dismissed.

All claims under section 1 of the Sherman Act are dismissed against all defendants except the Hospital, the ASA, and Drs. Vacanti, Blancato, Wender, Loeber, Chookaszian, Myent, and Konowitz. All claims under the section 2 of Sherman Act are dismissed against all defendants.

The state law claims against the individual members of the Executive Committee are dismissed, and all claims against all "unnamed" defendants are also dismissed.

## MEMORANDUM AND ORDER ON MOTIONS FOR RECONSIDERATION AND LEAVE TO CONDUCT DEPOSITIONS

Before us now are three motions by plaintiff. In her first motion she asks the court to reconsider its ruling dismissing her discrimination claims against several defendants named for the first time in her amended complaints (detailed in count V of her second amended complaint). In her second motion she asks the court to reconsider its dismissal of portions of her antitrust claim (detailed in count VI). In her third motion, submitted pursuant to Fed.R.Civ.P. 56(f), plaintiff asks for leave to conduct depositions of certain individuals prior to responding to defendants'

motion for summary judgment. Her first and third motions are granted in part and denied in part. Her second motion is denied.

## DISCUSSION

### Count V

This court has dismissed plaintiff's Title VII claims against several defendants because plaintiff failed to charge them within the applicable limitations period. *See Vakharia v. Swedish Covenant Hospital*, 824 F.Supp. at 773–74 (N.D.Ill. March 30, 1993). Invoking the doctrine of equitable tolling, plaintiff argues that she should not be barred from suing the dismissed defendants because they participated in various administrative proceedings at the hospital and thereby misled her into thinking that her medical staff privileges might be restored. Her argument is unpersuasive. Although, as a general rule, the doctrine of equitable tolling is applicable to Title VII cases, *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982), the decision by potential adversaries in a Title VII case to participate in administrative proceedings does not trigger it. *International Union of Electrical, Radio & Machine Workers, AFL–CIO Local 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 236, 97 S.Ct. 441, 447, 50 L.Ed.2d 427 (1976); *Lever v. Northwestern University*, 979 F.2d 552, 556 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2443, 124 L.Ed.2d 661 (1993).

In its order of March 31, 1993, this court noted that plaintiff's amended complaints were filed within the applicable limitations period to the extent that they alleged a claim under 42 U.S.C. § 1981 against members of the hospital's board of directors for impeding plaintiff's efforts to form new contracts with patients. *Vakharia*, 824 F.Supp. at 774. Plaintiff now indicates that two defendants who were named in the amended complaints, Arthur Peterson and Edward Cucci, were dismissed erroneously from count V because

an Kesala, Charles Mudd, Derek Kelly, Raymond DesRosiers, Bharat Shah, Howard Konowitz, Arthur Peterson, Edward Cucci, Judith Borenstein, Charles Vacanti, Louis Blancato, Ronald Wender, Alan Rogin, Jerrold Shapiro, Joseph D'Silva, Miguel Oviedo, Gary Melnick, Tun Myint, Richard Swedberg, Craig Anderson, Isolde Anderson, Robert E. Edlen, Milton B. Engebretson, Myrtle A. Erickson, the American Society of Anesthesiologists, and other unnamed members of the Hospital's Board of Directors.

she neglected to identify them as board members. Because defendants do not deny that Peterson and Cucci were board members, and because both have received adequate notice of the § 1981 claims against them, plaintiff's motion to reconsider must be granted with respect to them. However, plaintiff may proceed under count V against them only to the extent that they may be liable under § 1981, along with other named members of the board of directors, for impeding her efforts to form new contracts with patients.

### Count VI

In the same memorandum and order this court held that plaintiff could proceed with part of her antitrust claim under section 1 of the Sherman Act. Several distinctions were drawn, however, that significantly restricted the scope of her surviving claim. *Id.* at 778–79. Most of the defendants were dismissed from count VI because they could not be considered co-conspirators, and plaintiff's claim was a conspiracy claim. And, while the portion of the claim based on the hospital's decision to terminate plaintiff was spared, the portions of her claim based on the hospital's other acts, including its establishment of a "multi-tiered" system for assigning patients, were dismissed. Now plaintiff asks the court to allow her to pursue her antitrust claim against all defendants named in the second amended complaint and, in addition, she tentatively seeks permission to pursue an independent antitrust claim based on the multi-tiered system for assigning cases. As this court has indicated, the results plaintiff desires are foreclosed by several Supreme Court and Seventh Circuit decisions (cited in the March 31, 1993 order). Intra-corporate dealings of the sort alleged cannot constitute conspiracies, and claims premised on the restriction of competition within a single hospital are not cognizable under the federal antitrust laws.

Perhaps the hospital's establishment of a multi-tiered system of assigning cases was, as plaintiff says, a "step in the process that culminated in Dr. Vakharia's total loss of privileges." Even if true, however, that fact cannot justify granting plaintiff's motion to reconsider the partial dismissal of count VI, although it might constitute probative evidence concerning her antitrust claim based on the hospital's hindering her efforts to find placement elsewhere. Because trial is a long way away, the court need not resolve that evidentiary issue at this time.

### Motion Pursuant to Fed.R.Civ.P. 56(f)

Defendants have filed a motion for summary judgment on the first four counts. That motion is supported by three affidavits, from Dr. James B. McCormick, president of the hospital; Dr. Nancy Loeber, former chairman of the anesthesia department; and Dr. Alan Rogin, chairman of the *ad hoc* hearing committee. The thrust of that motion is that Dr. Loeber was brought in because of concerns about the quality of anesthesiological services, that she performed a performance audit of plaintiff and had concerns about a number of cases, that those concerns were not satisfactorily resolved but in the meantime plaintiff chose to go on part-time status, that thereafter the department was reorganized so as to have senior anesthesiologists for the more serious cases and junior anesthesiologists for the less serious cases, that (apparently) plaintiff was classified by Dr. Loeber as a junior anesthesiologist, that thereafter plaintiff sought to return to full-time status as a senior anesthesiologist, that Dr. Loeber then determined that the caseload would not support another full-time anesthesiologist in either classification and that plaintiff had not demonstrated sufficient proficiency for "senior" cases, that plaintiff objected, and that led to a review of the performance of Dr. Vakharia and ultimately of the entire department. That review began with Dr. Loeber, who came up with approximately 66 cases of plaintiff's in which Dr. Loeber believed the total care had been in one way or another inadequate. Plaintiff then requested the Medical Executive Committee (MEC) for return to full-time status. The MEC appointed a committee which considered the situation and reported to the MEC. The MEC concluded that another full-time position was not justified, but did not take a position on the quality-of-care issues. It decided, rather, to retain an independent consultant to evaluate plaintiff's work, and later that review was expanded to

include the entire department. It was performed by two doctors selected by the ASA and under the auspices of that organization. The review, as it pertained to plaintiff, included 43 cases involving major complications and 24 randomly selected cases, material submitted by plaintiff, and various interviews at the hospital, including extensive interviews of plaintiff. The report, issued in June 1989, included the recommendation that the medical staff privileges of Dr. Vakharia, as well as those of two other anesthesiologists, should not be renewed.

The hospital then gave plaintiff the option of resignation or summary suspension. Since plaintiff did not resign she was summarily suspended, and that triggered a hearing before an *ad hoc* committee of the MEC consisting of five physicians and a hearing officer. Attorneys were involved, for the most part, only in an advisory capacity. The hearings spanned 17 days and generated 3130 pages of testimony and argument, 38 exhibits from the hospital and over 200 from plaintiff. Dr. McCormick, Dr. Loeber, Janice Anderson and Dr. Wender (one of the ASA reviewers) testified at length, and plaintiff had 21 witnesses. The committee upheld the suspension and the MEC adopted the recommendation on May 9, 1990. That decision was appealed to the hospital's board, which appointed a review committee. That committee reviewed the lengthy submissions and the record and, on September 7, 1990, issued a 21–page report recommending that the MEC decision be adopted by the board, and it did so on September 12, 1990.

▮ We recite the defendants' summary judgment contentions at some length because they have a bearing on the pending motion. Plaintiff wants to take the depositions of at least 19 persons prior to responding to the motion. Defendants do not see why any are necessary but, in any event, they should not extend beyond the three affiants. We begin by noting that plaintiff is entitled to a reasonable opportunity to conduct necessary discovery on her claims prior to responding to the summary judgment motion. At the same time, we note that this court has the obligation, pursuant to Rule 26, to control discovery so that it is not unduly burdensome and

expensive. That obligation has been increasingly emphasized of late and concerns about discovery abuse underlie both the Civil Justice Reform Act direction that district courts adopt plans and the proposed amendments to the Federal Rules of Civil Procedure. Those proposed amendments, specifically Rule 30, would establish a maximum of ten depositions by a party as the norm for civil cases and that a witness once deposed should not normally be deposed again. Here the plaintiff seeks 19 depositions just for starters, including depositions of witnesses who were questioned at length in the *ad hoc* committee hearing. It is an ambitious program to depose virtually everyone who had or may have had some relationship to the process during which plaintiff's practice was curtailed and (considerably more significant in terms of the amount in controversy) thereafter suspended. And it goes too far in light of the position advanced by the defendants and the rather weak justifications advanced by plaintiff.

The motion relates primarily to the employment discrimination claims. Defendants say that plaintiff's troubles up to the suspension time stem from decisions made by Dr. Loeber. Janice Anderson was, it appears conceded, involved in securing information leading up to some of those decisions. Dr. McCormick was also knowledgeable about that period. Dr. Loeber and Dr. McCormick are affiants and plaintiff may depose them, but with due regard for the fact that they previously testified before the *ad hoc* hearing committee. Janice Anderson also testified there and plaintiff has presented no substantial reason why she must be questioned again. Plaintiff has presented no substantial reason to question that Dr. Loeber was the ultimate decisionmaker during that period or that others tainted the information upon which Dr. Loeber claimed she replied. We therefore see no reason to depose Karen Filopowski at this time. Dr. McCormick was familiar with hospital needs during that period. Judith Borenstein participated in the May 7, 1988 discussion of needs and assisted in providing information for the ASA review. We think plaintiff is entitled to depose her, but we are unconvinced that there is sufficient justification, for now, to take the depositions of Dr. Paulissian (who, after all, testi-

fied for plaintiff before the *ad hoc* committee) regarding the May 7, 1988 meeting or for any other purpose.

Plaintiff seeks the depositions of Dr. Blancato, Dr. Vacanti and Dr. Wender. Defendants contend that the ASA report was a significant matter in the ultimate suspension. Plaintiff is entitled to depose Dr. Blancato. We are not persuaded that the deposition of Dr. Vacanti is needed. He may have appointed the other two to be the surveyors, but the issues here relate to Dr. Vakharia, not ASA in general. Plaintiff has already, apparently, explored general procedures in her questions to Dr. Wender at the *ad hoc* committee hearing, and those can be explored adequately with Dr. Blancato as well. We do, moreover, permit the deposition of Dr. Wender. Defendants contend that plaintiff deliberately failed to explore quality-of-care issues with Dr. Wender. Because she was acting *pro se* at the time, we think her attorney is now entitled to make that inquiry.

Five physicians comprised the *ad hoc* committee. One, Dr. RPogin, is an affiant, and his deposition may be taken. She may also depose two of the four others, thus giving her access to a majority of a unanimous committee. We see no reason, however, to depose counsel (Callahan and Scott), absent some compelling evidence that they influenced the result and acted other than as attorneys. Further, if, as plaintiff claims, Scott prevented her from having witnesses testify she has knowledge about that matter, she can, herself, bring it to the attention of the court, and, if the hearing officer, Hannafan, was unfair, plaintiff can point that out from the 3130 pages of transcript. Finally, we are not persuaded that the depositions of Dr. Shah, Dr. Yelda or Dr. Larson have been reasonably justified.

We are somewhat uncertain how plaintiff is proceeding. Ordinarily depositions are for the purpose of getting information from nonparties or pinning down parties. It is the rare plaintiff who expects the defendants, or those allegedly in league with them, to make the case for her when the charges are of unsavory conduct, unless plaintiff has evidence to present to the defendants that requires an admission. Here the claims are of purposeful discrimination against her, claims that plaintiff has consistently presented for a number of years. To the extent she has personal knowledge of these claims, she can present that evidence by affidavit. To the extent she has evidence from others, she can also present it by their affidavits. Even with such evidence she must still address, now or ultimately, the quality-of-care issues raised by defendants.

Defendants are now scheduled to complete production of documents by June 23, 1993. The permitted depositions should be completed within the following 60 days, or by August 23, 1993. Plaintiff shall file her responsive brief by September 23, 1993 and defendants shall file their reply brief by October 14, 1993.

*Liability of Defendants in Their Individual Capacities*

At a recent status conference the parties expressed some confusion about the implications of this court's March 31, 1993 order on the personal liability of some of the defendants. Apparently the order requires some elaboration.

 As this court noted in its opinion of May 22, 1991, a defendant may be liable under Title VII and § 1981 even if the defendant is not the plaintiff's employer. *Vakharia v. Swedish Covenant Hospital,* 765 F.Supp. 461, 463 (N.D.Ill.1991). The same is true, presumably, of defendants sued under the ADEA, though the issue has not been raised in this case. Under all three statutes, if a defendant discriminatorily impedes a person's access to employment opportunities with third parties, the defendant may be liable. That much follows from the May 22, 1991 memorandum and order. The question the parties now raise is whether such a defendant may be liable in his or her individual capacity when the defendant was acting as an agent for someone else. The answer is yes.

 Under the ADEA, Title VII and § 1981, individuals may be held personally liable for civil rights violations they commit while working as agents of larger institutions, provided that their individual liability is based on individual acts distinct from institutional policy set by their superiors. When

a manager at a company terminates an employee on account of that employee's race or age, the company is liable,[1] as is the manager, unless the manager's decision was mandated by company policy set by someone else. Thus, decisionmaking employees who discriminate on the basis of age may be held liable in their individual capacities under the ADEA. *See e.g., Strzelecki v. Schwarz Paper Co.,* 824 F.Supp. 821 (N.D.Ill.1993); *House v. Cannon Mills Co.,* 713 F.Supp. 159 (M.D.N.C.1988); *Price v. Marshall Erdman & Associates, Inc.,* 966 F.2d 320, 324 (7th Cir.1992) (discussing personal liability of decisionmaker). Decisionmaking employees also may be held liable in their individual capacities under Title VII. *See Bridges v. Eastman Kodak Co.,* 800 F.Supp. 1172, 1180 (S.D.N.Y.1992); *Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1527 (M.D.Fla.1991); *Gaddy v. Abex Corp.,* 884 F.2d 312, 318–19 (7th Cir.1989) (discussing personal liability of decisionmaker); *E.E.O.C. v. Vucitech,* 842 F.2d 936, 942 (7th Cir.1988) (discussing personal liability of decisionmakers). And decisionmaking employees may be held liable under § 1981. *Al–Khazraji v. Saint Francis College,* 784 F.2d 505, 518–19 (3rd Cir.1986), *aff'd,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740, 753 (7th Cir. 1985); *Manuel v. International Harvester, Co.,* 502 F.Supp. 45, 50 (N.D.Ill.1980).

Courts around the country seem to be in complete agreement with respect to personal liability of decisionmaking employees under § 1981. As indicated, this court believes that individual defendants should be treated the same way under the ADEA and Title VII as they are under § 1981. This court recognizes, however, that other courts have treated ADEA and Title VII defendants differently. For example, in *Miller v. Maxwell's International, Inc.,* 991 F.2d 583 (9th Cir. 1993), the Ninth Circuit held that a supervisor could not be held personally liable under the ADEA for a discriminatory decision made on behalf of an employer corporation. In this district, Judges Duff and Aspen have reached a similar conclusion with respect to Title VII. *See Weiss v. Coca–Cola Bottling Co. of Chicago,* 772 F.Supp. 407, 411 (N.D.Ill. 1991); *Pommier v. James L. Edelstein Enterprises,* 816 F.Supp. 476, 481 (N.D.Ill.1993). Judge Duff's opinion reflects the reasoning of the courts that have rejected personal liability of corporate agents: the only remedies available under Title VII, he points out, are remedies that "an employer, not an individual, would generally provide."[2] *Id.* While granting the premise, this court respectfully disagrees with the conclusion.

Title VII always has served two purposes: to compensate the victims of discrimination (at least with back pay, if not with full compensatory damages), and to deter discrimination in the future. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–418, 95 S.Ct. 2362, 2371–2372, 45 L.Ed.2d 280 (1975). To conclude that personal accountability of supervisory employees is unnecessary to reinstate victims or to award them their back pay is to neglect Title VII's broader goal of eradicating discrimination.

Moreover, while ordinarily personal liability is not of great consequence either to the

---

1. When a private company is involved, the acts of an employee can create § 1981 liability for an employer. *See Gatlin v. Jewel Food Stores,* 699 F.Supp. 1266, 1268–69 (N.D.Ill.1988); *Montgomery v. Campbell Soup Co.,* 647 F.Supp. 1372, 1378 (N.D.Ill.1986). However, when a municipal agency is involved, the municipal employee's isolated acts will not subject the municipal employer to liability under § 1981—at least as § 1981 existed prior to the Civil Rights Act of 1991—unless the employee was following established policy. *Jett v. Dallas Independent School District,* 491 U.S. 701, 735–36, 109 S.Ct. 2702, 2722–23, 105 L.Ed.2d 598 (1989); *East v. City of Chicago,* 719 F.Supp. 683, 688 (N.D.Ill.1989). In other words, under *Jett, respondeat superior* claims against municipalities are void under

§ 1981, just as they are void under § 1983. *See Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978).

2. Judge Duff was describing Title VII as it existed prior to the Civil Rights Act of 1991. As noted previously, the 1991 amendments to Title VII and § 1981 do not apply to this case. However, if the amendments did apply, Judge Duff's argument would lose virtually all of its force, since the 1991 amendments allow for full compensatory damages—not just back pay—as well as punitive damages. *See Bridges,* 800 F.Supp. at 1180.

plaintiff or to the individual defendant (and perhaps that is why the issue is seldom considered), there are cases, like *Vucitech*, 842 F.2d 936, in which the defendant company goes bankrupt and the plaintiff is forced to seek recovery from the supervisory employees who committed the discriminatory acts. As this court noted in *Strzelecki*, if the people who make discriminatory decisions do not have to pay for them, they may never alter their illegal behavior and the wrongdoers may elude punishment entirely, while the victim may receive no compensation whatsoever. That outcome is incompatible with the broad remedial purposes of the ADEA and Title VII, which were intended to provide all "necessary relief" and to ensure "complete justice." *Albemarle Paper Co.*, 422 U.S. at 418, 95 S.Ct. at 2372.

## CONCLUSION

Plaintiff's motion to reconsider the court's partial dismissal of count V is granted in part and denied in part. Her motion to reconsider the court's partial dismissal of count VI is denied. Her motion pursuant to Fed. R.Civ.P. 56(f) is granted in part and denied in part.