Patricia SCHALLEHN, Plaintiff,

v.

CENTRAL TRUST AND SAVINGS BANK and Steve Drennan, Defendants.

No. C 93–4088.

United States District Court, N.D. Iowa, Western Division.

Feb. 17, 1995.

William Kevin Stoos of Klass, Hanks, Stoos, Stoik, Mugan & Villone, Sioux City, IA, for plaintiff.

Maurice B. Nieland and Michael W. Ellwanger of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, Sioux City, IA, for defendants.

**AMENDED AND SUBSTITUTED ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

BENNETT, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND .............. 1319
II. STANDARDS FOR SUMMARY JUDGMENT ........................ 1321
III. FINDINGS OF FACT ........................................... 1322
 A. Undisputed Facts .............................................. 1322
 B. Disputed Facts ................................................ 1323
IV. LEGAL ANALYSIS ............................................. 1324
 A. Defendants' Joint Motion For Summary Judgment ................ 1324
 1. Genuine Issues Of Fact ...................................... 1325
 2. Lack Of Legal Authority For Judgment On The State Law Claim 1328
 B. Drennan's Motion For Summary Judgment ..................... 1328

1. The Split In Authority On Individual Liability Under The ADEA 1329
2. Plain Meaning And Congressional Intent ..................... 1331
3. Agency Principles ........................................ 1334
 a. Authorities For Application Of Agency Principles .......... 1334
 b. Applicable Principles Of Agency Law....................... 1336
 c. The Analysis Of Individual Liability Under The ADEA ..... 1337
4. Individual Liability Of Drennan ............................. 1338
 a. Agency ........................................ 1338
 b. Agent Of An Appropriate Employer ....................... 1338
 c. Tortious Conduct By The Agent............................ 1338
V. CONCLUSION ............................................... 1339

Plaintiff, a former employee of a bank's insurance agency, brought this employment discrimination suit against the bank and the bank's vice president in charge of personnel decisions alleging that she was terminated in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and similar provisions of Iowa's Civil Rights Act, Iowa Code Ch. 216. The defendant bank vice president has moved for summary judgment on the ground that, as a co-employee or supervisory employee, he cannot be held individually liable under the ADEA. The bank and the bank vice president have also jointly moved for summary judgment on the grounds that the former employee cannot establish a *prima facie* case of age discrimination or any evidence of discriminatory intent.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff Patricia A. Schallehn filed this lawsuit following her termination on January 7, 1993, from her employment as the secretary for an insurance agency within a bank located in Cherokee, Iowa. Schallehn, who had been absent from her employment for some time recuperating from an automobile accident, had informed her employer that she was ready to return to work. However, her immediate supervisor, the insurance agent for the bank's insurance agency, told Schallehn that the bank had no positions available for her. Schallehn's former position had been filled by someone else during the period of Schallehn's recuperation.

Following exhaustion of EEOC and Iowa Civil Rights Commission procedures, Schallehn filed this lawsuit on October 5, 1993.

Schallehn named as defendants the Central Trust and Savings Bank (Bank), which was her employer, and Steve Drennan, the Bank's vice president, whom Schallehn identified as the representative of the Bank who initiated the plan and made the decision to terminate her, and who directed Schallehn's direct superior, insurance agent Dan Hickman, to fire her.

Count I of Schallehn's complaint alleges that, at the time she was terminated, Schallehn was 58 years old, and that her termination constituted age discrimination in violation of provisions of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623. The complaint asserts that Schallehn's termination was despite the fact that during the period of her recuperation she had repeatedly been assured that her position would be kept open for her. The complaint alleges further that Drennan, who was 40 years old at the time, nonetheless decided to terminate Schallehn because he preferred to employ younger people, including the person who had filled Schallehn's position during her recuperation, who was believed to be 42 years old at the time. Count II of the complaint asserts that the same age discriminatory conduct alleged in Count I also violates Iowa Code § 216.6 and that the court may entertain this claim under its pendant jurisdiction.

Defendants answered the complaint on October 25, 1993. The parties filed a scheduling report on November 30, 1993, following which Chief Magistrate Judge John A. Jarvey entered a scheduling order on December 14, 1993. The scheduling order, *inter alia*, established a deadline for dispositive motions of October 1, 1994.[1] However, on December

---

1. The parties' scheduling report suggested a dis- positive motion deadline of November 15, 1994.

8, 1994, during a telephonic scheduling conference, Magistrate Judge Paul Deck, Jr., orally granted an oral request for an extension of the dispositive motion deadline to December 30, 1994.

On September 30, 1994, on the eve of the original dispositive motion deadline, defendant Drennan moved for summary judgment, initially on both counts of the complaint. Drennan asserted in his motion that, as a co-employee of the plaintiff, he could not be held individually liable for age discrimination. On October 5, 1994, the court requested that Drennan supplement his motion for summary judgment on the question of the liability under the ADEA of a supervisory employee. On October 14, 1994, before Drennan supplemented his motion for summary judgment, Schallehn filed her resistance. Drennan filed the requested supplementation on October 19, 1994, and in it states that "Defendant Steve Drennan's Motion for Summary Judgment is directed only toward Count I of the Complaint." Defendant Drennan's Brief Statement Of Authorities In Support Of Motion For Summary Judgment, p. 1. The court will therefore consider this motion as a motion for partial summary judgment as to Count I only.

On December 14, 1994, finding that neither party had requested oral arguments on Drennan's motion for partial summary judgment pursuant to the court's local rules,[2] the court entered an order requiring any party desiring oral arguments to notify the court of that desire by written motion not later than December 21, 1994. Neither party requested oral argument.[3]

On December 28, 1994, on the eve of the extended deadline for dispositive motions, both defendants jointly moved for summary judgment on both counts of Schallehn's complaint. This motion for summary judgment asserted that there was no genuine issue of material fact which, even if decided favorably to the plaintiff, would "(1) generate a prima facie case, or (2) meet the Plaintiff's burden of proof to establish discriminatory intent." Defendants' December 28, 1994, Motion For Summary Judgment, p. 1. Schallehn resisted this motion for summary judgment on the grounds that the motion was "belated and untimely," Plaintiff's Supplemental Resistance To The Motions For Summary Judgment, p. 1, and that there were indeed genuine issues of material fact and legal issues precluding summary judgment in favor of defendants.[4] Neither party requested oral argument on this second motion for summary judgment either. On January 11, 1995, this court set a jury trial in this matter for three days during the two-week period beginning March 13, 1995, at 9:00 a.m.

The imminent trial date for this matter makes prompt resolution of the motions for summary judgment critical. The parties appear to agree that the court should resolve

2. N.D.Ia. LR 14(c) provides as follows:

> c. **Arguments.** Motions shall be submitted and determined upon the motion papers hereinafter provided. Oral argument of motions may be had on the court's own motion or *on the written request and showing of cause by any party and upon order of court. Such request shall be separately stated at the conclusion of the motion or memorandum and shall be noted in the caption.*

3. The court does not believe that every dispositive motion requires oral argument before the court enters its ruling, and the court assumes that the decision not to request oral argument as provided for in N.D.Ia. LR 14(c) indicates that the movant does not desire such argument. The movant's decision not to request a hearing may be due to a number of reasons, including the movant's desire to reduce costs, belief that the matter is best and most fully submitted in written form with little to be gained from oral argument,

a desire to avoid the difficulties of obtaining a timely hearing when courts are confronted with overburdened dockets and attorneys have difficult scheduling problems of their own even apart from attempting to coordinate the appearance of counsel for multiple parties, and consequently a desire to avoid delay in resolution of the matter.

4. The parties have addressed few of their arguments to the merits of Count II, which is based on Iowa Code § 216.6. The court, however, noted in its order of October 5, 1994, that the Iowa Supreme Court had not yet addressed the question of supervisory or co-employee liability under Iowa Code § 216.6, and that there were important distinctions in the statutory definition of the term "employer" in the Iowa Civil Rights Act, § 216.2(7), as distinguished from both the statutory definition of "employer" in Title VII and in the ADEA, making suspect a decision concerning supervisor or co-employee liability under Ch. 216 based simply on an analogy to the federal acts.

these motions on the basis of the written submissions, and the court will therefore proceed on that basis.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini*, 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman*, 953 F.2d 394, 396 (8th Cir. 1992).

 The standard for granting summary judgment is well established. *Rule 56* of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. ... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine*

issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Munz v. Michael*, 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.*, 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone*, 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini*, 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[5] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Schallehn, and give Schallehn the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael*, 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.*, 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield*, 939 F.2d 666, 667 (8th Cir.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

██ Procedurally, the moving party or parties, here Drennan and the Bank, bear "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553); *see also Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). Drennan and the Bank are not required by *Rule 56* to support their motions with affidavits or other similar materials negating the opponent's claim. *Id.*

**5.** An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hartnagel*, 953 F.2d at 394.

"When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Schallehn is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir. 1994).

In *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel,* 953 F.2d at 396 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). If Schallehn fails to make a sufficient showing of an essential element of a claim with respect to which she has the burden of proof, then Drennan and the Bank are "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Woodsmith,* 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Burk,* 948 F.2d at 492; *Woodsmith,* 904 F.2d at 1247.

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M-Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Hardin v. Hussmann Corp.,* 45 F.3d 262 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.,* 910 F.2d 492, 495 (8th Cir. 1990), and *Hillebrand,* 827 F.2d at 364). Summary judgment is appropriate only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Crawford,* 37 F.3d at 1341 (quoting *Johnson,* 931 F.2d at 1244). The court reasoned that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Id.* (holding that there was a genuine issue of material fact precluding summary judgment); *Johnson,* 931 F.2d at 1244. With these standards in mind, the court turns to consideration of the defendants' motions for summary judgment.

## III. FINDINGS OF FACT

### A. Undisputed Facts

Schallehn, who was 58 years old at the time of her termination on January 7, 1993,

was employed as the insurance secretary for the Bank's in-house insurance agency. The only employees of the Bank's in-house insurance agency were Dan Hickman, who was the insurance agent, and Schallehn. The Bank, located in Cherokee, Iowa, had a total of twenty-one employees at the Cherokee main bank, including Schallehn and Hickman, and in addition had a one-person branch bank in Quimby, Iowa.

Steve Drennan was the vice president of the Bank, and was responsible for its day-to-day operations, including hiring and firing decisions. The president of the Bank, John Keeline, now deceased, who was in his early eighties at the time of Schallehn's discharge, continued to play some part in management of the Bank. The principal stockholders of the Bank were Keeline and his wife, but Drennan also owned just over 12% of the Bank's stock during 1992 and 1993.

Schallehn had begun working for the Bank in 1985, following interviews with John Keeline, and possibly also with Dan Hickman.[6] Although Schallehn's duties in the insurance office were primarily secretarial, she was licensed to sell some kinds of insurance products and received a small share of premiums generated by the office.[7] Schallehn had obtained her licenses to sell various insurance products at the request of her employers. Schallehn was told by both Drennan and Hickman that the Bank was disappointed with the volume of insurance business being done by the in-house agency during 1992, and that she would be expected to increase her sales volume in order to get a raise in salary.

On August 7, 1992, Schallehn was injured in an automobile accident. She was unable to work until mid-September. During her absence, other Bank employees performed her duties. Owing to continuing medical problems during October and November of 1992, Schallehn was only able to work half

days. Cindy Carstens, who had previously worked at the Quimby branch of the Bank, and who was 42 years old at the time, filled in for Schallehn during this period. Another employee, JoAnn Rupp, was trained to fill the position at the Quimby branch. In mid-November of 1992, Schallehn underwent surgery related to her injuries in the automobile accident, and Carstens filled in full-time in the Bank's insurance office.

On or about January 6, 1992, Schallehn expressed to Dan Hickman her desire to return to work on January 11, 1992. Hickman and Drennan then had a meeting to discuss whether or not to allow Schallehn to return to her former position. Drennan was averse to Schallehn's return, preferring to retain Carstens as the secretary for the in-house insurance agency. Drennan therefore consulted with the Bank's attorney, George Wittgraff, in order to obtain advise about whether or not the Bank would encounter difficulties if they did not retain Schallehn. Drennan also consulted Keeline, who apparently concurred in Drennan's decision to terminate Schallehn and retain Carstens in the secretarial position for the insurance agency.

Drennan therefore directed Hickman to inform Schallehn that they had no positions available for her with the Bank. Schallehn has not applied for any other positions with the Bank.

## B. Disputed Facts

Schallehn asserts a number of factual disputes she considers material to her claims and which would therefore preclude summary judgment. First, Schallehn asserts that Drennan, by virtue of his position as vice president in charge of operations and personnel decisions and Keeline's age and limited involvement in management matters, was, for all practical purposes, the Bank. He set the policies and made all significant personnel

6. The memories of Schallehn and Hickman are not entirely clear on this point, but who interviewed Schallehn prior to her hiring does not appear to this court to be material to the issues raised by her discharge several years later.

7. Schallehn's premium "commissions" generally amounted to between $50 and $65 per month. Schallehn testified in deposition, and was no-

where contradicted on this point, that her small share of premiums was not tied to any particular insurance sales, but to the premiums taken in by the office generally. Schallehn asserts that she was never required to seek insurance sales outside of the office, but was licensed primarily to service "walk-in" customers.

decisions. Schallehn asserts that defendants have taken mutually exclusive positions before the EEOC and this court, asserting in the earlier proceedings that Keeline was one of the persons involved in the decision to terminate Schallehn, but admitting in these proceedings that Keeline did not involve himself in personnel matters. Schallehn asserts that Drennan initiated and compelled the decision to fire her, requiring Hickman to do the actual notification of Schallehn, and trumping up the scenario that the termination decision was a joint one among Drennan, Keeline, and Hickman.

Schallehn also asserts that Drennan's decision to fire her was part of a pattern of behavior by Drennan to terminate older employees and to replace them with younger ones. Schallehn asserts that an example of this conduct prior to her termination involved the termination of Lois Anderson, also 58 years old at the time of her termination, and her replacement by Halley Dessel, who was in her thirties. Furthermore, Schallehn asserts that just days after her own termination, Drennan admitted to a Cherokee attorney that he "liked to hire younger employees." Schallehn also asserts that Drennan spoke disparagingly of Keeline as "that old man" and stated that he could improve the Bank's performance if he could get rid of Keeline.

Schallehn also alleges that up until the motions for summary judgment filed in this matter, defendants have always asserted that her termination was because there was no position available for her, but now are attempting to claim that she was terminated for "substandard performance." Schallehn asserts that defendants' various characterizations of the grounds for her termination and the identity of the parties involved in that decision demonstrate either a genuine issue of material fact as to the grounds for her termination, or demonstrate that defendants' proffered reasons for their actions are not worthy of belief.

At the very least, Schallehn asserts that there is a genuine issue of material fact as to the following: (1) whether her performance was substandard; (2) whether she was less-qualified and her performance was less good than her younger replacement; (3) whether she was assured throughout her recuperation by Dan Hickman that she would be welcomed back to her former position upon her recovery;[8] and (4) who was responsible for the poor performance of the insurance office during 1992. Schallehn argues that any of the issues of fact that she has asserted are genuine and material to disposition of this case, because all reflect on the reasons for her termination and the credibility of the defendants' explanations for it.

## IV. LEGAL ANALYSIS

Because the court concludes that the latter motion for summary judgment may be more briefly disposed of, that motion for summary judgment will be addressed first. The court will then turn to the more complicated issues involved in Drennan's motion for partial summary judgment on the ground that, as a co-employee or supervisory employee, he cannot be held individually liable under the ADEA.

### A. Defendants' Joint Motion For Summary Judgment

The court concludes that the defendants' joint motion for summary judgment, not filed until December 28, 1994, must be denied on two grounds. First, the court finds that there are a number of genuine issues of material fact precluding summary judgment on either Count I, the ADEA claim, or Count II, the Iowa Civil Rights Act claim. Second, the court finds that defendants have identified no legal authority that, even in the absence of a genuine issue of material fact, would require summary judgment in their favor on Schallehn's state law claim.[9]

---

8. Schallehn asserts specifically that Dan Hickman told her that they would "move bodies around" if necessary in order to return her to her former position upon her return to work.

9. Schallehn's assertion that the motion for summary judgment must be denied on the ground that it is "belated and untimely" cannot stand in the face of the magistrate judge's oral grant of an extension of time to file such a motion until December 30, 1994.

### 1. Genuine Issues Of Fact

The court concludes that there are genuine issues or fact precluding summary judgment in this case. Defendants argue that even if any genuine issues of fact were decided in Schallehn's favor, she would be unable to establish either a *prima facie* case of age discrimination or discriminatory intent. The court does not agree.

■■■■ The allocation of the burden of proof in ADEA cases has been held to be the same as in cases arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e–17 (1988). *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448 (8th Cir.1993); *Beshears v. Asbill,* 930 F.2d 1348, 1353 nn. 6 & 7 (8th Cir.1991). *See also Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 888–89 (9th Cir.1994) (citing *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1420 (9th Cir.1990)); *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 919 (11th Cir.1993) (citing *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989)); *Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1425 n. 2 (10th Cir.1993) (citing *MacDonald v. Eastern Wyoming Mental Health Ctr.,* 941 F.2d 1115, 1119 (10th Cir.1991)); *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 180 (2d Cir.1992) (citing *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1568 (2d Cir.1989)); *United States EEOC v. Century Broadcasting Corp.,* 957 F.2d 1446, 1450 (7th Cir.1992) (citing *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991)). Similarly, the burdens of establishing a *prima facie* case of discrimination are the same under the ADEA, Title VII, and § 1983. *Hicks v. St. Mary's Honor Ctr.,* 970 F.2d 487, 490–91 (8th Cir.1992), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Richmond v. Board of Regents of the Univ. of Minnesota,* 957 F.2d 595, 598 (8th Cir.1992) (burden of showing *prima facie* case of discrimination is the same under Title VII, § 1981, § 1983, or the ADEA).

■■■■ It is axiomatic that employment discrimination need not be proved by direct evidence, and indeed, that doing so is often impossible, because, as the Supreme Court has said, "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1108 (8th Cir.) (citing *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1483, 75 L.Ed.2d 403 (1983)), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994). Thus, in employment discrimination cases based on circumstantial evidence, courts apply the analytical framework of shifting burdens developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and most recently in *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *Gaworski,* 17 F.3d at 1108.

■■■■ Under *McDonnell Douglas* and its progeny, the employment discrimination plaintiff has the initial burden of establishing a *prima facie* case of discrimination by producing evidence that would entitle the plaintiff to prevail unless contradicted and overcome by evidence produced by the defendant. *White v. McDonnell Douglas Corp.,* 985 F.2d 434, 435 (8th Cir.1993). To establish a *prima facie* case of discrimination under Title VII, the ADEA, or § 1983, the plaintiff must show that the defendant terminated the plaintiff under circumstances which gave rise to an inference of unlawful discrimination. *Davenport v. Riverview Gardens Sch. Dist.,* 30 F.3d 940, 945 (8th Cir.1994); *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1242 (8th Cir.1991) (Title VII discriminatory discharge case).[10] If a *prima facie* case is established,

---

10. The *prima facie* case criteria, however, differ for each type of employment decision. *Davenport,* 30 F.3d at 944; *Hervey v. City of Little Rock,* 787 F.2d 1223, 1231 (8th Cir.1986). Thus, in a case alleging age discrimination, the elements of the *prima facie* case are: (1) that the plaintiff was a member of a protected group on the basis of his or her age; (2) that the plaintiff was performing his or her job at a level that met the employer's legitimate expectations; (3) that plaintiff was discharged; and 4) that the employer replaced or attempted to replace the plaintiff with a younger person. *Radabaugh,* 997 F.2d at 447; *Beshears,* 930 F.2d at 1353; *Raschick v. Prudent Supply,*

the burden then shifts to the employer to rebut the presumption by producing evidence that the employer made the questioned employment decision for a legitimate, non-discriminatory reason. *Id.* The employer's explanation of its actions must be "clear and reasonably specific," *Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096, but the employer's burden of production has nonetheless been held to be "exceedingly light." *Batey v. Stone,* 24 F.3d 1330, 1334 (11th Cir.1994) (citing *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1019 (11th Cir.1994)). If the employer meets this burden of production, the legal presumption that would justify a judgment as a matter of law based on the plaintiff's *prima facie* case "simply drops out of the picture," and the plaintiff bears the burden of persuading the finder of fact that the proffered reasons are pretextual and that the employment decision was the result of discriminatory intent. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749.

▆ The Supreme Court has made clear that the ultimate inquiry is whether the employer intentionally discriminated against the plaintiff. *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *White v. McDonnell Douglas Corp.,* 985 F.2d 434, 436 (8th Cir.1993); *United States v. Johnson,* 28 F.3d 1487, 1494 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995); *Johnson,* 931 F.2d at 1242; *Brooks v. Monroe Systems For Business, Inc.,* 873 F.2d 202, 204 (8th Cir.), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989); *Washburn v. Kansas City Life Ins. Co.,* 831 F.2d 1404, 1408 (8th Cir.1987). However, if the defendant's proffered reasons are rejected, the trier of fact may infer the ultimate fact of intentional discrimination. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."); *Harvey*

*v. Anheuser–Busch, Inc.,* 38 F.3d 968, 971 (8th Cir.1994) (quoting *St. Mary's*); *EEOC v. Cherry–Burrell Corp.,* 35 F.3d 356, 361 (8th Cir.1994) (quoting *St. Mary's*); *Gaworski,* 17 F.3d at 1109 (quoting *St. Mary's*); *Hicks v. St. Mary's Honor Ctr.,* 2 F.3d 265, 266 (8th Cir.1994) (quoting *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749); *Brooks,* 873 F.2d at 204 (submission by the employer of a discredited reason for discharging or failing to promote a person is itself evidence of discriminatory motive.). The finding of discriminatory intent is generally for the trier of fact. *Burger v. McGilley Memorial Chapels, Inc.,* 856 F.2d 1046, 1047 (8th Cir.1988). Thus, in the present case, if there is a genuine issue of material fact on Schallehn's *prima facie* case, and a genuine issue of material fact as to the credibility of defendants' proffered legitimate basis for their employment decision, there is also a genuine issue of material fact on discriminatory intent, which is generally for the trier of fact to decide.

▆ In the present case, the record clearly establishes genuine issues of fact as to elements of Schallehn's *prima facie* case. There are genuine issues of material fact as to whether Schallehn was qualified for her position based on defendants' assertions that her performance had been "substandard." Similarly, there are genuine issues of material fact as to defendants' proffered reasons for Schallehn's dismissal. Specifically, the record demonstrates genuine issues of fact as to the basis for the decision to discharge Schallehn (and by whom that decision was made), if performance of the insurance agency had been poor and who was responsible for that poor performance, and whether the decision to terminate Schallehn was contrary to assurances she had received during her recuperation. The court also finds that there are genuine issues of material fact directly related to the question of defendants' discriminatory intent. For example, Schallehn has demonstrated a genuine issue of material fact as to whether or not Drennan regularly discriminated against older employees in favor

*Inc.,* 830 F.2d 1497, 1499 (8th Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d

272 (1988).

of younger ones or harbored biases in favor of younger employees over older ones.

■ The summary judgment record contains an allegation that Drennan told another person shortly after Schallehn was terminated that he "likes to hire younger employees." Furthermore, the summary judgment record also contains an allegation that Drennan spoke disparagingly of Keeline as "that old man" and stated that he could improve the Bank's performance if he could get rid of Keeline. The court concludes that, at least at the summary judgment stage, Drennan's comments cannot be characterized merely as "stray remarks."

The stray remarks doctrine has its genesis in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), wherein Justice O'Connor stated in her concurring opinion that "stray remarks in the workplace ... cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804. Comments suggesting that the employer may have considered impermissible factors are often relevant to a disparate treatment claim. *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438 (9th Cir.1990). "On the other hand 'stray' remarks are insufficient to establish discrimination." *Id.* (citing *Price Waterhouse,* 490 U.S. 228, 251, 277 and 280, 109 S.Ct. 1775, 1791, 1804 and 1806 (1989)). Numerous decisions have held that specific statements of employees are "stray remarks" and, thus, not evidence of discrimination. *See e.g., Turner v. North American Rubber, Inc.,* 979 F.2d 55, 58–59 (5th Cir.1992) (finding that reference by boss to "three young tigers" being sent to assist plaintiff more than one year before his discharge was not related to plaintiff's age or his discharge); *Guthrie v. Tifco Indus.,* 941 F.2d 374, 378–79 (5th Cir.1991) (holding that comment by retired president of corporation that his son who succeeded him would "need to surround himself with people his age" was a stray remark because of the vagueness, remoteness in time and administrative hierarchy to personnel decision), *cert. denied sub nom., Guthrie ex rel. Guthrie v. Tifco Indus.,* — U.S. ——, 112 S.Ct. 1267, 117 L.Ed.2d

495 (1992); *Merrick,* 892 F.2d at 1438–39 (remark by decision maker that he chose another individual over plaintiff because the other individual was "a bright, intelligent, knowledgeable young man," is a stray remark); *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314–16 (6th Cir.1989) (finding that a "single, isolated discriminatory comment" by plaintiff's immediate supervisor was insufficient to trigger burden shift or to avoid summary judgment for defendant); *Smith v. Firestone Tire & Rubber Co.,* 875 F.2d 1325, 1330 (7th Cir.1989) (noting that stray "remarks, ... when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria even when such statements are made by the decision maker in issue.").

There appears to be no unified test for determining whether certain statements fall within the stray remarks doctrine. Rather, as the above cases demonstrate, courts look to the relationship between the remarks and the decisional process, the age-based substance of the statements, the specificity of the statements both with regard to the actual employment decision at issue such as hiring, promotion, or termination, as well as the relationship of the remark to the plaintiff's situation, and its remoteness in time from the personnel decision. Several recent decisions from the United States Court of Appeals for the Eighth Circuit, *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir.1993) (distinguishing comments "which demonstrate a 'discriminatory animus in the decisional process' or those uttered by individuals closely involved in employment decisions" from "stray remarks"); *Kehoe v. Anheuser-Busch, Inc.,* 995 F.2d 117, 119 (8th Cir.1993) (considering whether identifying retired employees as "moochers" was indicative of age discriminatory animus); *Frieze v. Boatmen's Bank of Belton,* 950 F.2d 538, 541–42 (8th Cir.1991) (comment made more than four years prior to discharge decision was a "stray remark"); *Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir.1991) ("stray remarks" are those made by nondecisionmakers or statements of decisionmakers unrelated to the decisional process); *Blake v. J.C. Penney Co., Inc.,* 894 F.2d 274, 276–78 (8th Cir.1990) (toleration of age-directed com-

ments was itself evidence of age discrimination), substantially assist in defining the contours of the stray remarks doctrine in our circuit. *See generally Holmes v. Marriott Corp.*, 831 F.Supp. 691, 705 (S.D. Iowa 1993) (providing synopses of Eighth Circuit holdings).

The court notes that the parties have not had the opportunity to brief or argue the potential "stray remarks" issue. Upon analyzing the statements attributed to Drennan here, the court finds, at least for the purposes of this summary judgment motion, that there is at least a genuine issue of material fact that they are directly and specifically related to the decisional process, both in management of the Bank generally and in specific hiring and firing decisions, are age-based in substance, relate to plaintiff's situation, and were made in close proximity to the personnel decisions in question here. Thus, they may not constitute stray remarks, but may instead have some probative value in establishing discriminatory intent. The statement that Drennan "likes to hire younger employees," made shortly after retaining a younger employee in Schallehn's former position and discharging Schallehn, bears an obvious relationship to the question of discriminatory intent here. Similarly, Drennan's apparent disparaging of Keeline on the basis of his age also goes to the question of Drennan's discriminatory biases. The present record generates a genuine issue of material fact as to Drennan's age discriminatory intent.

The court therefore concludes that defendants' joint motion for summary judgment should be denied on the ground that there are genuine issues of material fact precluding judgment in defendants' favor.

### 2. Lack Of Legal Authority For Judgment On The State Law Claim

As a second ground for denying defendants' joint motion for summary judgment, the court concludes that defendants' have fatally failed to produce any legal authority for their assertion that they are entitled to judgment as a matter of law on Schallehn's state law claim. Because the court concluded above that there are genuine issues of material fact precluding summary judgment in defendants' favor on Schallehn's age discrimination claim under the ADEA, and defendants have failed to produce any legal authority that the result would be any different under Iowa Code § 216.6, defendants have failed to carry their burden for judgment in their favor as to this state law claim.

Summary judgment in favor of both defendants and against Schallehn on both counts of her complaint is not appropriate on the grounds asserted in the defendants' joint motion for summary judgment. Therefore, the court turns to consideration of Drennan's earlier motion for partial summary judgment in his favor on Schallehn's ADEA claim.

### B. Drennan's Motion For Summary Judgment

Defendant Drennan's motion for summary judgment in his favor on Schallehn's ADEA claim asserts that, as a co-employee or supervisory employee, he cannot be held individually liable under the ADEA. Drennan's initial argument was that he was merely Schallehn's "co-employee" at the Bank, and that the ADEA was not intended to impose co-employee liability. Subsequently, Drennan broadened his argument to take into account his obvious supervisory capacity over employees of the Bank by asserting that even if he was a supervisory employee, he cannot be subjected to ADEA liability.

Schallehn responds to these arguments by contending that the ADEA specifically allows agents of the employer to be sued. Schallehn asserts further that without individual liability, there will be no deterrent effect of a decision vindicating her right to be free from age discrimination on the prime wrong-doer in this case, Steve Drennan. For all practical purposes, Schallehn argues, Drennan *was* the Bank, and to allow him to hold up the Bank as the only proper defendant allows him to escape the liability that properly belongs on his shoulders. Schallehn focuses the court's attention on the fact that Drennan was the chief discriminating party, and furthermore was a part owner of the Bank, and thus central to any misconduct by the Bank, but is no longer working for the Bank, so

that he would not be deterred by any penalty imposed upon the Bank for his misconduct.

The court notes first the significant split in authority on the issue of individual liability of supervisory employees under the ADEA and the silence of the Eighth Circuit Court of Appeals on this issue. Not surprisingly, both parties claim that the better reasoned view in this split of authority supports their own position.

### 1. The Split In Authority On Individual Liability Under The ADEA

The ADEA's definition of "employer" is the source of the present turmoil among the federal courts on the question of whether individuals may be held liable under the statute. The ADEA defines an employer as "a person engaged in an industry affecting commerce who has twenty or more employees ... and any agent of such a person." 29 U.S.C. § 630(b). Courts have split on the issue of whether the "and any agent" language, which is also present in Title VII, 42 U.S.C. § 2000e(b), and the Americans With Disabilities Act (ADA), 42 U.S.C. § 12111(5)(A), was intended by Congress simply to provide *respondeat superior* liability under these federal antidiscrimination statutes, or was intended, as the Acts appear to say, to include "agents" within the definition of "employers" who may be held liable for violations of the Acts.

▮ This split was starkly demonstrated by the district court in *Jendusa v. Cancer Treatment Ctrs. of Am., Inc.*, 868 F.Supp. 1006, 1009–10 (N.D.Ill.1994), in which the court identified a myriad of cases from the Northern District of Illinois alone which showed no uniform conclusions.[11] Finding that "[a]s the number of divergent opinions ... reveals, the question of personal liability under these federal antidiscrimination statutes does not readily admit of any easy answers," the *Jendusa* court further pointed out the lack of a guiding decision from the Seventh Circuit Court of Appeals. *Id.* at

1010. The court next noted the pervasiveness of the split in authority on this issue:

> In addition to this split within the courts of the Northern District [of Illinois], there is a split among the courts of appeal that have considered the issue with the Fifth, Ninth, Tenth, and Eleventh Circuits holding that individual liability may not be imposed against supervisory or management personnel under Title VII or the ADA, *see Grant v. Lone Star Co.*, 21 F.3d 649, 651–53 (5th Cir.1994), *petition for cert. filed* Aug. 25, 1994; *Miller v. Maxwell's Int'l*, 991 F.2d 583, 587–88 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994); *Sims v. KCA Inc.*, [28 F.3d 113,] 1994 WL 266744, 1994 U.S.App. LEXIS 15065 (10th Cir.1994); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991), and the Fourth and Sixth Circuits holding that individual liability may be imposed. *See Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989), *vacated in part on rehearing on other grounds*, 900 F.2d 27 (4th Cir.1990); *Jones v. Continental Corp.*, 789 F.2d 1225, 1231 (6th Cir.1986); *but see Birbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 65 Fair.Empl.Prac.Cas. 669, 671–72 & n. 1 (4th Cir.1994) (distinguishing *Paroline* and holding that actions against decisionmakers may not be maintained under ADEA), [*cert. denied*, —— U.S. ——, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994)].

*Id.* at 1010. This court concurs in the *Jendusa* court's decision to follow the minority view, and impose liability on supervisory employees. *Id.*

Like the *Jendusa* court, this court is also confronted by a lack of a controlling decisions from the Eighth Circuit Court of Appeals. Although the Eighth Circuit Court of Appeals was confronted with a similar issue in *Smith v. St. Bernards Regional Med. Ctr.*, 19 F.3d 1254 (8th Cir.1994), this court does not read that decision as controlling. In *St.*

---

**11.** The court in *Jendusa* identified the split in authority within its district as involving ten decisions holding that there is no individual liability for supervisory employees or officers of a company, or no individual liability at all, under Title

VII, the ADEA, or the ADA, and thirteen holding that individual liability may be upheld under these antidiscrimination statutes as to supervisory or decisionmaking employees.

*Bernards,* the Eighth Circuit Court of Appeals dismissed claims of race discrimination against co-workers, concluding that "the claims against individual defendants were properly dismissed because liability under 42 U.S.C. § 2000e(b) can attach only to employers." *Id.* at 1255. Thus, the Court of Appeals was not asked to decide the question of whether supervisory employees or agents of the employer fell within the definition of "employer" under the antidiscrimination act involved, and therefore subject to liability under that act.

Only two decisions from the federal courts in this state, in contrast to the plethora of cases from the Northern District of Illinois, have addressed the question of the liability of supervisory employees under antidiscrimination statutes. In *Accordino v. Langman Constr., Inc.,* 862 F.Supp. 237 (S.D. Iowa 1994), a Title VII case, Judge Harold Vietor noted first that the Eight Circuit Court of Appeals has not ruled on this issue. *Accordino,* 862 F.Supp. at 238.[12] The court also noted that

> [d]istrict courts within the Eighth Circuit are split. *Compare Russell v. City of Overland Police Dep't,* 838 F.Supp. 1350, 1352 (E.D.Mo.1993) (suggesting that employees may be liable under Title VII if they qualify as agents); *with Dunham v. City of O'Fallon, Mo.,* No. 4:93CV02677, 1994 WL 228598 (E.D.Mo. May 12, 1994) (no individual liability under Title VII) *and Stafford v. State,* 835 F.Supp. 1136, 1148–49 (W.D.Mo.1993) (same).

*Id.* The court in *Accordino,* however, concluded that

> [i]t is implausible that this structure [of exempting from Title VII employers with fewer than fifteen employees], which purposefully excludes or limits the liability exposure of small businesses, would simultaneously allow recovery against individuals who are employed by a covered employer, such as supervisors.

*Id.* Finally, the court rejected the notions that either the broad interpretation of Title VII's definition of employer, *id.* at 239 (citing *Lamirande v. Resolution Trust Corp.,* 834 F.Supp. 526, 527–28 (D.N.H.1993), and *Raiser v. O'Shaughnessy,* 830 F.Supp. 1134, 1137 (N.D.Ill.1993), as using this rationale), or the need for deterrence, *id.* (citing *Vakharia v. Swedish Covenant Hosp.,* 824 F.Supp. 769, 785 (N.D.Ill.1993), as using this rationale), would justify a departure from the position of the greater weight of authorities. *Id.* In an unpublished decision, Judge Charles Wolle found the analysis presented in *Accordino* to be persuasive, and also concluded that supervisory employees were not intended by Congress to be held personally liable under either Title VII or the ADEA. *Engstrand v. Pioneer H–Bred Int'l, Inc.,* No. 4–94–CV–80326, 1994 WL 780902 (S.D. Iowa filed Nov. 21, 1994).[13]

Also of interest is the decision of Judge Limbaugh of the Eastern District of Missouri in *Williams v. Rothman Furniture Stores, Inc.,* 862 F.Supp. 239 (E.D.Mo.1994). In *Williams,* the court reluctantly concluded that liability under Title VII cannot attach to individual defendants in their personal capacities. *Id.* at 240–41. The court again surveyed the split in authority on the issue of supervisory liability, but based its conclusion on the following:

> It appears that this issue has yet to be addressed definitively by the Eighth Circuit Court of Appeals. As recently as March 1994, the Eighth Circuit has held that claims against individual defendants fail under Title VII because liability only attaches to employers. *Smith v. St. Bernards Regional Medical Center,* 19 F.3d 1254, 1255 (8th Cir.1994). However, the *Smith* case dealt with a Title VII claim

---

12. The court discounted *Hall v. Gus Constr. Co.,* 842 F.2d 1010 (8th Cir.1988), as binding precedent on this issue, finding that "[i]t is not clear that the Eighth Circuit was presented with the specific issue of a supervisor's personal liability." *Accordino,* 862 F.Supp. at 238. The court also opined that amendments to Title VII in 1991, which added compensatory and punitive damages in 42 U.S.C. § 1981a, rendered most pre–1991 cases on supervisory liability inapposite.

13. In the *Engstrand* decision, Judge Wolle specifically noted that "Iowa appellate courts, rather than federal appellate courts, should decide state law questions, such as whether the Iowa Civil Rights Act allows an employee to bring a civil rights action against supervisory employees." *Engstrand,* slip op. at 2.

against co-employees who were not in supervisory positions with respect to the plaintiff. Although the Court is impressed with those cases which hold that liability, under Title VII, may extend to those individuals, who although [they] are not the plaintiff's "employer", still possess a certain degree of control with regard to employment opportunities; it does not feel that it can follow the holdings of these courts in light of the Eighth Circuit Court of Appeals' consistent holdings that liability under Title VII cannot attach to individual defendants in their personal capacity.

*Id.* at 240–41. The court therefore dismissed Title VII claims against supervisory employees. *Id.* at 240.

Although this court will not be surprised if the Eighth Circuit Court of Appeals ultimately follows the greater weight of authorities, as have all recent circuit courts of appeals decisions, by holding that supervisors cannot be subjected to personal liability under Title VII or the ADEA, this court is persuaded by the minority view on the issue. Without controlling precedent on this issue, this court is obligated to make its own assessment of the issue, and feels compelled by its own analysis to conclude, albeit joining with the minority of authorities, that personal liability under the ADEA does lie against supervisory employees. Because of the ample discussion of the issue available in prior decisions from other courts, and the numerous rationales advanced, this court will focus on the grounds it finds most persuasive for concluding that an individual, supervisory employee can be held liable for alleged violations of the ADEA. As the court in *Jendusa* remarked,

> The arguments on both sides of the issue have been amply articulated in [prior] opinions ... and there is little to be gained from rehashing them in detail yet another time.

*Jendusa,* 868 F.Supp. at 1010.[14] The grounds this court finds most persuasive involve the language of the ADEA itself, congressional intent as expressed in both that language and in the legislative history, and the application of the agency principles to the question as directed by the Supreme Court in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). To avoid rehashing old ground, this opinion will discuss more fully than have courts hitherto agency principles and their application to the question of the liability of supervisory employees under the ADEA. Nonetheless, the court looks first to the plain meaning of the statute in question.

### 2. Plain Meaning And Congressional Intent

The best means for determining whom Congress intended to subject to liability under the ADEA is an examination of the language of the ADEA. "The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *United States ex rel. Harlan v. Bacon,* 21 F.3d 209, 210 (8th Cir.1994) ("When construing a statute, we are obliged to look first to the plain meaning of the words employed by the legislature," and the court "must give effect to the unambiguously expressed intent of Congress," citing *Chevron*); *United States v. Manthei,* 979 F.2d 124, 126 (8th Cir.1992) ("When interpreting statutory language, the court must first look to the plain meaning of the language," citing *North Dakota v. United States,* 460 U.S. 300, 312–13, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983)). The Supreme Court describes this rule as the "one, cardinal canon before all others." *Connecticut Nat'l Bank v. Ger-*

---

14. The court would, however, point to these additional secondary authorities, not otherwise discussed in the body of this opinion, as marshalling the arguments for and against the liability of individuals, co-employees, and supervisory employees under the various federal antidiscrimination statutes: Christopher Greer, *Note: "Who,* *me?": A Supervisor's Individual Liability For Discrimination In The Workplace,* 62 FORDHAM L.REV. 1835 (1994); Phillip L. Lamberson, *Comment: Personal Liability For Violations Of Title VII: Thirty years Of Indecision,* 46 BAYLOR L.REV. 419 (1994).

*main,* 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Thus, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citing, *Ron Pair,* 489 U.S. at 241–242, 109 S.Ct. at 1030–31; *United States v. Goldenberg,* 168 U.S. 95, 102–103, 18 S.Ct. 3, 4, 42 L.Ed. 394 (1897); *Oneale v. Thornton,* 6 Cranch 53, 68, 3 L.Ed. 150 (1810)).

 When the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances "the sole function of the courts is to enforce [the statute] according to its terms." *Ron Pair,* 489 U.S. at 241, 109 S.Ct. at 1030 (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)); *Melahn v. Pennock Ins., Inc.,* 965 F.2d 1497, 1502 (8th Cir.1992) (plain meaning of a statute governs over ambiguous legislative history, citing *Ron Pair Enterprises*). The plain meaning of a statute is decisive, "except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair,* 489 U.S. at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *INS v. Cardoza–Fonseca,* 480 U.S. 421, 452, 107 S.Ct. 1207, 1223, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring in judgment) (ordinary meaning governs unless implementing it would be "patent absurdity").

 However, "[p]lain meaning, like beauty, is sometimes in the eye of the beholder," *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 737, 105 S.Ct. 1598, 1603, 84 L.Ed.2d 643 (1985). Thus, the court must not reach its decision about the meaning of a statute

> by a strict construction of the words of the Act, nor by application of artificial canons of construction. On the contrary, we are to read the statutory language in its ordinary and natural sense, and if doubts remain, resolve them in the light, not only of the policy intended to be served by the enactment, but, as well, by all other available aids to construction. But it is not our function to engraft on a statute additions

> which we think the legislature logically might or should have made.

*Bacon,* 21 F.3d at 210 (quoting *United States v. Cooper,* 312 U.S. 600, 605, 61 S.Ct. 742, 744, 85 L.Ed. 1071 (1941)). Thus, the court must assume that the words of a statute, construed in their ordinary meaning, accurately express the legislative purpose, and the court should decline to frustrate the plain meaning of the words chosen by Congress. *United States v. Talley,* 16 F.3d 972, 976 (8th Cir.1994).

 It is also a principle of construction for antidiscrimination statutes that, because of their remedial nature, definitions within those acts should be given a liberal construction. *Tart v. Hill Behan Lumber Co.,* 31 F.3d 668, 671 (8th Cir.1994) (recognizing remedial purpose of Title VII requires liberal interpretation, citing *Cobb v. Stringer,* 850 F.2d 356, 359 (8th Cir.1988)); *Clayton v. White Hall Sch. Dist.,* 875 F.2d 676, 679 (8th Cir.1989) ("Title VII of the Civil Rights Act of 1964 is to be accorded a liberal construction in order to carry out the purpose of Congress to eliminate the inconvenience, unfairness, and humiliation of racial discrimination," quoting *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421, 425 (8th Cir. 1970)); *see also Mardell v. Harleysville Life Ins. Co.,* 31 F.3d 1221, 1234 & n. 23 (3rd Cir.1994) ("as remedial statutes, Title VII and ADEA should be liberally construed to advance their beneficent purposes," and "[o]ne overriding lesson the 1991 Act [broadening available damages provisions] tutors all but its most unmindful reader is that Congress was unhappy with increasingly parsimonious constructions of Title VII. Essentially, Congress forcefully reminded courts of the canon that Title VII and ADEA, as remedial statutes, are to be construed liberally to promote their welfare purposes, equality of treatment and employment opportunities."); *Crozier v. Howard,* 11 F.3d 967, 969 n. 3 (10th Cir.1993) (the ADEA is "remedial and humanitarian legislation" and should be interpreted liberally so as to effectuate congressional intent"); *Richardson v. Frank,* 975 F.2d 1433, 1436 (10th Cir.1991) ("Title VII is remedial legislation to be construed liberally rather than technically," quoting *Pe-*

terson v. City of Wichita, 888 F.2d 1307, 1309 (10th Cir.1989), cert. denied, 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990)); MacDonald v. Eastern Wyoming Mental Health Ctr., 941 F.2d 1115, 1118 (10th Cir. 1991) ("[t]he ADEA is remedial and humanitarian legislation and should be liberally interpreted to effectuate the congressional purpose of ending age discrimination in employment," quoting Dartt v. Shell Oil Co., 539 F.2d 1256, 1260 (10th Cir.1976), aff'd, 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 (1977)). However, the court's interpretation cannot contradict the statutory definition. Zimmerman v. North American Signal Co., 704 F.2d 347, 353 (7th Cir.1983); Baker v. Stuart Broadcasting Co., 560 F.2d 389, 391 (8th Cir.1977).

In the present case, the language of the ADEA's definition of "employer" expressly includes "agents" of employers with a sufficiently large number of employees. 29 U.S.C. § 630(b). Thus, applying the plain meaning of the statute, "agents" are among the persons who may be held liable under the ADEA. Liability would be imposed upon these individuals, according to this court's reading of the statute, only when two conditions are met: (1) when the individual is an "agent" of the employer, and (2) that employer already falls within the purview of ADEA liability by virtue of the number of its employees. To ignore this meaning of the language by asserting that it was intended only to provide for *respondeat superior* liability seems to this court to be disingenuous, at best, and at worst a tortured construction.[15] Compare United States v. Gibbens, 25 F.3d 28, 34 (1st Cir.1994) (interpreting meaning of

"victim" under Victim and Witness Protection Act (VWPA), 18 U.S.C. §§ 3663–3664, and concluding that identifying the government, the party who set up a "sting" operation, as a "victim" entitled to restitution would be as disingenuous as "calling the rabbit who lurks in Houdini's hat a magician.").

The only significant argument offered by other courts to suggest that this plain meaning would be contrary to the intent of the drafters is that stated, e.g., in Miller v. Maxwell's Int'l Inc., 991 F.2d 583 (9th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994):

Title VII limits liability to employers with fifteen or more employees ... and the ADEA limits liability to employers with twenty or more employees ... in part because Congress did not want to burden small entities with the costs associated with litigating discrimination claims. If Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees.

Id. at 587; see also Grant v. Lone Star Co., 21 F.3d 649, 652 (5th Cir.1994), petition for cert. filed Aug. 25, 1994 (citing Miller with approval); Accordino, 862 F.Supp. at 238. Contrary to the conclusions of the Ninth and Fifth Circuit Courts of Appeals, however, this court finds nothing in a congressional concern for protecting small businesses from the burdens of compliance with antidiscrimination legislation that is demonstrably at odds with imposing liability upon certain individuals.[16] Different policy considerations

---

**15.** The statutory language, "and any agent," strikes this court as a peculiarly odd congressional choice of language if Congress' purpose was merely to impose *respondeat superior* liability. Existing legal principles have already made clear that an employer could, under certain circumstances, be held liable for the intentionally discriminatory acts of its agents. Thus, it appears that the plain meaning of "and any agent" must be something more than imposing *respondeat superior* liability. This court's view is in accord with the conclusions of the court in Jendusa:

It does not require a congressional enactment to render a corporation or other institutional employer responsible for its employees' actions taken on its behalf. And if that really were Congress' limited intention, it surely chose an

odd and roundabout way of doing so—why would it enact a provision that defined such employees as "agents" coming within the definition of "employer," instead of including a direct statement of *respondeat superior* liability in the statute? Cassano v. DeSoto, 860 F.Supp. 537, 538–39 (N.D.Ill.1994).

Jendusa, 868 F.Supp. at 1012.

**16.** This court agrees with the Jendusa court's conclusion that

[t]he Miller opinion works a slight-of-hand by describing Congress' desire to protect small businesses as one "to protect small entities with limited resources" and then arguing, *a fortiori*, that Congress intended to protect individuals.

are involved in imposing liability on small businesses from those involved in imposing liability upon certain individuals acting on behalf of employers that are themselves large enough to be subjected to ADEA liability. The reason Congress decided not to subject small employers to compliance with the ADEA was because of its desire not to subject a vital part of the nation's economy to certain restrictions. *See Jendusa*, 868 F.Supp. 1006, 1015 (at the time Title VII, for example, was enacted, small businesses constituted 92% of the nations employers, citing Remarks of Sen. Humphrey, 110 CONG. REC. 13088 (1964)). Different policy considerations, however, weigh in favor of subjecting to liability under antidiscrimination statutes the individuals responsible for the very acts of wrong-doing prohibited by the antidiscrimination statutes, especially when such individuals will only be subjected to liability when their acts are on behalf of an employer who falls within the purview of those antidiscrimination statutes.

Subjecting to liability both employers large enough to fall under the ADEA's restrictions and agents of such employers is in keeping with the purpose of the ADEA. The ADEA's goal is to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). Thus, the ADEA forbids employment discrimination against employees aged forty and older. 29 U.S.C. § 631(a); *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 448 (8th Cir.1993). It provides that it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[17] More generally, the intent of antidiscrimination legislation has been identified as primarily remedial, *Tart*, 31 F.3d at 671 (recognizing remedial purpose of Title VII); *Clayton*, 875 F.2d at 679; *Cobb*, 850 F.2d at 359; *Baker*, 560 F.2d at 391; *see also Mardell*, 31 F.3d at 1234 & n. 23; *Crozier*, 11 F.3d at 969 n. 3; *Richardson*, 975 F.2d at 1436; *MacDonald*, 941 F.2d at 1118; *Zimmerman*, 704 F.2d at 353, with the specific goal of deterring discriminatory employment practices and ensuring that complete justice is secured by victims of discrimination. *Abermarle Paper Co. v. Moody*, 422 U.S. 405, 417–18, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975); *Gaworski*, 17 F.3d at 1113 n. 8 (principles articulated in *Abermarle*, a Title VII case, apply with equal force to ADEA, as goal of both statutes is remedial elimination of discrimination in the workplace); *Wilde v. County of Kandiyohi*, 15 F.3d 103, 105 (8th Cir.1994) (Title VII and ADEA have broad remedial goals of eliminating workplace discrimination). Those goals can be met most effectively if the party who represents an employer and whose conduct was actually discriminatory can be reached directly by the statute and subjected to individual liability. *See Jendusa*, 868 F.Supp. at 1011–12 (expressing considerable doubt that indirect deterrence of such supervisory employees through marketplace pressures resulting from imposing liability only on their employers was either an effective deterrent or the deterrent intended by Congress).

### 3. Agency Principles

#### a. Authorities For Application Of Agency Principles

The meaning ascribed to the statute by this court is further confirmed by the Supreme Court's decree that in the context of discussing employer liability under Title VII

---

*Jendusa*, 868 F.Supp. at 1015.

**17.** The ADEA prohibitions protect workers over age forty. 29 U.S.C. § 631(a). As originally enacted, the ADEA covered employees from 40 to 65 years old. Pub.L. No. 90–202, § 12, 81 Stat. 607 (repealed 1978). The maximum age was raised in 1978 to cover persons aged 40 to 70 years. Pub.L. No. 95–256, § 4, 92 Stat. 190 (repealed 1986). In 1986 Congress removed the upper age limitation entirely, Pub.L. No. 99–592, § 2, 100 Stat. 3342–43 (codified at 29 U.S.C. § 631(a)), except for bona fide mandatory retirement laws for firefighters and law enforcement officers, *Id.* §§ 3–4, 100 Stat. 3342–43 (codified at 29 U.S.C. § 623(i)), and tenure for college professors over age 70. *Id.* § 6, 100 Stat. 3344 (codified at 29 U.S.C. § 631(d)).

for the acts of an agent, "Congress wanted courts to look to agency principles for guidance...." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). The Court recognized that "such common-law principles may not be transferable in all their particulars to Title VII," but that such principles were generally appropriate where Congress decided to define "employer" to include any "agent" of an employer, thus identifying the relationship between employers and supervisory employees that could establish liability under Title VII. *Id.; see also Wilde,* 15 F.3d at 106 (considering common-law agency principles in Title VII case to determine who was an employee); *Frankel v. Bally, Inc.,* 987 F.2d 86, 90 (2d Cir.1993) (agency principles are applicable to who is an employee under the ADEA); *Davis v. Tri–State Mack Distributors, Inc.,* 981 F.2d 340, 343 n. 1 (8th Cir. 1992) (discussing *Meritor's* application of agency principles to a Title VII case of an employer's liability for a supervisor's acts); *Hall v. Gus Const. Co., Inc.,* 842 F.2d 1010, 1015 (8th Cir.1988) (reiterating that *Meritor* required courts to look to agency principles to determine employer's liability for acts of agent under Title VII); *but see Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 577 (10th Cir.1990) (finding agency principles in Restatement (Second) of Agency generally applicable to questions of employer and agent liability under Title VII, although specific principles might be inapplicable in the circumstances because of the nature of the discrimination).

Following the lead of the Supreme Court in *Meritor,* at few courts have applied or considered the application of agency principles to the specific question presented here of whether a supervisor may be held personally liable for discriminatory conduct, rather than the question of whether the employer may be held liable for the agent's discriminatory acts. *See Shager v. Upjohn Co.,* 913 F.2d 398, 404 (7th Cir.1990); *Jendusa,* 868 F.Supp. at 1012–13; *Griffith v. Keystone Steel & Wire Co.,* 858 F.Supp. 802, 806 (C.D.Ill.1994). In *Shager,* the Seventh Circuit Court of Appeals wrote in *dicta* that

[t]he Age Discrimination in Employment Act is not completely silent on the issue of agency. The Act imposes liability only on employers, but defines "employer" to include "agent," 29 U.S.C. § 630(b), a term that embraces but is more encompassing that "employee": all employees are agents, but not all agents are employees. So it may seem obvious that Asgrow is responsible fore Lehnst's discriminatory actions. In fact this inference is not compelled. The statutory language that we have quoted could mean nothing more than that Lehnst, the agent, is liable along with Asgrow, or even possibly instead of Asgrow. Shager could have sued Lehnst (perhaps, on this reading, only Lehnst), but did not. *House v. Cannon Mills Co.,* 713 F.Supp. 159, 159–62 (M.D.N.C.1988), and cases cited there. On this understanding, the statute is silent on the issue of derivative liability and it is thus left to the courts to decide as a matter of federal common law whether to apply the doctrine of respondeat superior in age discrimination cases.

*Shager,* 913 F.2d at 404. Two district courts have used agency principles to conclude specifically that supervisory employees could be held liable under either Title VII or the ADEA. In *Griffith,* the district court, again citing *House v. Cannon Mills Co.,* and observing the Seventh Circuit Court of Appeals' citation of that case with approval in *Shager,* concluded that the liability provision of Title VII permits suits against individual employees who qualify as employers as defined by the statute. *Griffith,* 858 F.Supp. at 806. The court found that

[t]he Restatement (Second) of Agency states that "Principal and agent can be joined in one action for a wrong resulting from the tortious conduct of an agent ... and a judgment can be rendered against each." Rest. (2d) Agency, § 359C(1) (1957). Thus, the law of agency recognizes personal liability for agents.

*Id.* This statement from *Griffith* was used to support the conclusion of the *Jendusa* court that agency principles dictated the liability of supervisory employees under Title

VII. *Jendusa,* 868 F.Supp. at 1013.[18]

This court finds no reason why, if agency principles are applicable to the question of whether a claimant may hold a principal liable for discriminatory conduct of an agent, the purpose for which those principles were invoked in *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408, agency principles should not also be applicable to the question of whether the claimant may hold the agent liable. The court therefore turns to identification of applicable principles of agency law as articulated in the Restatement (Second) of Agency. *See Hirschfeld,* 916 F.2d at 577 (looking to Restatement as articulating the applicable principles of agency law); *Jendusa,* 868 F.Supp. at 1012–13 (same); *Griffith,* 858 F.Supp. at 806 (same).

*b. Applicable Principles Of Agency Law*

Definitions of agency and the authority of an agent are stated in Restatement (Second) of Agency, § 1 and § 7, respectively. Section 1 is as follows:

§ 1. Agency; Principal; Agent

(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to

his control, and consent by the other so to act.

(2) The one for whom action is to be taken is the principal.

(3) The one who is to act is the agent.

Restatement (Second) of Agency, § 1. The authority of an agent is

the power of an agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him.

Restatement (Second) of Agency, § 7.

Of particular interest here, however, is the liability of an agent for his or her own tortious conduct. These principles are articulated in several sections of the Restatement. Section 343 provides the general rule that

[a]n agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal, except where he is exercising a privilege of the principal, or a privilege held by him for the protection of the principal's interests, or where the principal owes no duty or less

---

**18.** Other courts have carried on a similar discussion of the personal liability of "decisionmaking" employees, as was recognized by the district court in *Vakharia v. Swedish Covenant Hosp.,* 824 F.Supp. 769 (N.D.Ill.1993):

Under the ADEA, Title VII and § 1981, individuals may be held personally liable for civil rights violations they commit while working as agents of larger institutions, provided that their individual liability is based on individual acts distinct from institutional policy set by their superiors. When a manager at a company terminates an employee on account of that employee's race or age, the company is liable, [footnote omitted] as is the manager, unless the manager's decision was mandated by company policy set by *someone else.* Thus, decisionmaking employees who discriminate on the basis of age may be held liable in their individual capacities under the ADEA. *See e.g., Strzelecki v. Schwarz Paper Co.,* 824 F.Supp. 821 (N.D.Ill.1993); *House v. Cannon Mills Co.,* 713 F.Supp. 159 (M.D.N.C.1988); *Price v. Marshall Erdman & Associates, Inc.,* 966 F.2d 320, 324 (7th Cir.1992) (discussing personal liability of decisionmaker). Decisionmaking employees also may be held liable in their individual capacities under Title VII. *See Bridges v. Eastman Kodak Co.,* 800 F.Supp. 1172, 1180 (S.D.N.Y.1992); *Robinson v. Jacksonville Ship-*

*yards, Inc.,* 760 F.Supp. 1486, 1527 (M.D.Fla. 1991); *Gaddy v. Abex Corp.,* 884 F.2d 312, 318–19 (7th Cir.1989) (discussing personal liability of decisionmaker); *E.E.O.C. v. Vucitech,* 842 F.2d 936, 942 (7th Cir.1988) (discussing personal liability of decisionmakers). And decisionmaking employees may be held liable under § 1981. *Al–Khazraji v. Saint Francis College,* 784 F.2d 505, 518–19 (3rd Cir.1986), *aff'd,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740, 753 (7th Cir.1985); *Manuel v. International Harvester, Co.,* 502 F.Supp. 45, 50 (N.D.Ill.1980).

*Vakharia,* 824 F.Supp. at 784. *See also Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir. 1993) (An individual qualifies as an "employer" under Title VII if he or she serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing, or conditions of employment); *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir.1989) (same), *aff'd in pertinent part,* 900 F.2d 27 (4th Cir.1990) (en banc). However, the court does not believe that it is necessary to consider the "decisionmaking" status of an individual employee, because any such consideration is encompassed in the application of agency principles, and the ADEA itself defines an "employer" in terms, not of decision-making, but of agency.

than the normal duty of care to the person harmed.

Restatement (Second) of Agency, § 343.[19] Most critically, § 359C provides that a principal and agent may be joined in the same action, and explains the relationship between judgments of liability as to each:

(1) Principal and agent can be joined in one action for a wrong resulting from the tortious conduct of an agent or that of agent and principal, and a judgment can issue against each.

(2) If the action is based solely upon the tortious conduct of the agent, a judgment on the merits for the agent and against the principal, or a smaller judgment for compensatory damages against the agent than against the principal, is erroneous.

Restatement (Second) of Agency, § 359C. Thus, it is a general principle of the law of agency that agents may be held personally liable. *Griffith*, 858 F.Supp. at 806 (citing § 359C).

The comment to § 359C states that it is a duplicate of § 217B and that the comments to that section are applicable to this one. *Id.*, comment a. Comment d to the earlier section, states that

"[i]f there is an independent ground for finding the principal liable, judgment can be entered against him and for the agent.... If, however, judgment is rendered against both for a single harm, the judgment should be for the same amount, in the absence of award of punitive damages."

**19.** Compare § 350, regarding negligent action of an agent.

An agent is subject to liability if, by his acts, he creates an unreasonable risk of harm to the interests of others protected against negligent invasion.

Restatement (Second) of Agency, § 350. However, liability under Title VII and the ADEA requires "intentional" discrimination. *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1481–82; *White*, 985 F.2d at 436; *Johnson*, 28 F.3d at 1494; *Johnson*, 931 F.2d at 1242; *Brooks*, 873 F.2d at 204; *Washburn*, 831 F.2d at 1408.

**20.** This conclusion is to be distinguished from Schallehn's argument that it is appropriate to hold Drennan personally liable in part because he is an owner of some share of the Bank's stock.

Restatement (Second) of Agency, § 217B, comment d.

■ Application of these principles to the question before the court leads to the conclusion that an agent can be held personally liable for his or her tortious conduct, even if the principal may also be held liable. The liability of an agent, however, depends upon that agent's own, tortious conduct. Thus, not every agent is liable for, in this case, discriminatory conduct; only those agents who engaged in the tortious conduct can be held liable under principles of agency law.[20]

■ Nothing in the language or legislative history of the ADEA requires a departure from these principles concerning the personal liability of an agent for his or her tortious conduct. To the contrary, the language of the statute expressly identifies both the principal and agent as parties to whom the ADEA applies. Thus, the language and legislative history of the ADEA, as well as the applicable agency principles, dictate that liability under the ADEA extend to individuals who are (1) agents, (2) of an employer subject to the ADEA, and (3) whose tortious conduct or whose conduct with that of the principal caused the wrong to the plaintiff.

#### c. The Analysis Of Individual Liability Under The ADEA

■ The analysis of individual liability on the three prongs of this test would be as follows. First, the court, applying agency principles found, *e.g.*, in Sections 1 and 7 of the Restatement (Second) of Agency, must determine whether the individual sought to

Although the court finds Schallehn's argument attractive, not least because Drennan's stock ownership appears to distinguish this case from other decisions addressing individual liability, and because it would render moot consideration of agency principles, the court finds such an argument ultimately to add more complex issues than it resolves. The court concludes that allowing personal liability of shareholders by virtue of their ownership of stock in a company subject to liability under Title VII or the ADEA is not sanctioned by the language of either Act, does not appear to be supported by the legislative history of either Act, and furthermore would raise complex equitable and legal issues concerning piercing of the corporate veil.

be held liable is an agent of the employer. Second, applying the definition of "employer" found in the ADEA, 29 U.S.C. § 630(b), the court must determine whether the individual is an agent of an employer against whom ADEA liability may be asserted. This prong of the analysis, of course, counts the employer's employees to see if the employer has the requisite twenty or more. The third prong of the analysis requires the court to look both to the ADEA, for definitions of the tortious conduct it prohibits, and to agency principles as stated, *e.g.,* in Restatement (Second) of Agency, § 359C, to determine whether the agent either alone or with the principal has engaged in that tortious conduct, and thus may be held individually liable. The court turns next to an application of this analytical procedure to determine whether Drennan could be held individually liable under the ADEA.[21]

### 4. Individual Liability Of Drennan

 Having concluded that liability under the ADEA extends to agents of employers also subject to the ADEA, the court must next consider whether Drennan is, or whether there is a genuine issue of material fact as to whether he is, such an individual. The court's determination here goes only so far as is necessary to dispose of the motion for summary judgment, and is not intended to preclude the parties from trial on the merits of the issue of Drennan's individual liability.

#### a. Agency

There is, at the very least, a genuine issue of material fact as to whether or not Drennan is the Bank's agent. It is undisputed that Drennan, as vice president of the Bank, exercised substantial day-to-day control over the Bank's management, including hiring and firing. The Bank consented to Drennan's conduct in that position, and appears to have concurred even in the specific decisions Drennan made regarding Schallehn. Restatement (Second) of Agency, § 1. Plainly, Drennan's decisions were within his power as

an agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him. Restatement (Second) of Agency, § 7. The record is replete with evidence that Drennan, for all practical purposes, ran the Bank, and that Keeline was aware of and approved of his conduct in both general management decisions and the specific management decisions Schallehn asserts ran afoul of the ADEA and Iowa Code Ch. 216. Thus, the first prong of the individual liability analysis is satisfied.

#### b. Agent Of An Appropriate Employer

The parties do not dispute that the Bank is an employer as defined in the ADEA. Specifically, the Bank had a total of twenty-one employees at the Cherokee main bank, including Schallehn and Hickman, and in addition had a one-person branch bank in Quimby, Iowa. In order to be an "employer" under the ADEA, the entity must be "engaged in an industry affecting commerce who has twenty or more employees...." 29 U.S.C. § 630(b). This prong of the analysis is also satisfied.

#### c. Tortious Conduct By The Agent

This third prong of the analysis requires the court to look first to the ADEA for definitions of the tortious conduct it prohibits. Then the court must look to agency principles as stated, *e.g.,* in Restatement (Second) of Agency, § 359C, to determine whether the agent either alone or with the principal has engaged in that tortious conduct, and thus may be held individually liable.

The ADEA provides that it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In the present case, Schallehn has indeed alleged that Drennan, either alone or with

---

21. The analysis at this point is, of course, in the context of a motion for summary judgment. Thus, the court need only determine whether there is a genuine issue of material fact as to each prong for summary judgment in Drennan's favor to be precluded. If a genuine issue of material fact is apparent from the record, a final determination of Drennan's individual liability should rest upon the fullness of proof offered at trial.

others in the Bank's management, discharged her because of her age. The court determined above that there was at least a genuine issue of material fact as to whether such tortious conduct had been directed at Schallehn by the defendants here.

The analysis must next turn to agency principles to determine whether Drennan, the agent here, may be held individually liable for the tortious conduct in which he engaged on his own or with his principal. Section 359C of the Restatement (Second) of Agency provides that in the circumstances alleged here, judgment may issue against either Drennan or the Bank. Furthermore, Drennan is not relieved of individual liability simply because he acted on behalf of the Bank, or even if he acted on the command of Keeline rather than on his own authority. *See, e.g.,* Restatement (Second) of Agency, § 343 ("[a]n agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal, except where he is exercising a privilege of the principal....."). Neither Drennan nor the Bank was privileged to discharge an employee in an age discriminatory fashion—the ADEA was established precisely to forbid such conduct by employers. 29 U.S.C. § 623.

Drennan has argued, *inter alia,* that his presence as an individual defendant in this lawsuit serves no purpose, because the jury's verdict form will not look any different whether or not he is a part of the lawsuit. The court concludes that principles of agency law articulated in § 359C of the Restatement dictate a different result. Section 359C and the duplicate provisions of § 217B make it clear that the agent, here Drennan, and the principal, here the Bank, may be joined in one action *and judgment can issue against each,* or against the Bank alone if there is an independent ground for the Bank's liability. Furthermore, under the principles articulated in these sections of the Restatement, the judgment, if founded solely on Drennan's tortious conduct, should be in the same amount against each defendant. Restatement (Second) of Agency, § 217B, comment d (as incorporated into Restatement (Second) of Agency, § 359C, by comment a). Thus,

Drennan's presence in this lawsuit does make a material difference, under principles of agency law, in the way a jury could award damages, and the verdict form must be constructed to reflect that.

The court therefore concludes that, as a matter of law, liability under the ADEA may be asserted against "agents" of an "employer" who falls within the statute's definition of an "employer." Furthermore, there is at least a genuine issue of material fact as to whether or not Drennan is such an agent, in other words, such an individual, against whom liability under the ADEA may lie. Drennan's motion for partial summary judgment in his favor on the ground that individual liability under the ADEA cannot attach to him should therefore be denied.

## V. CONCLUSION

The court concludes that defendants' joint motion for summary judgment must be denied on two grounds. First, there are at the very least genuine issues of material fact as to the elements of Schallehn's *prima facie* case and the requisite discriminatory intent of the defendants which may be found on the basis of that *prima facie* case and disbelief by the factfinder of the employers' proffered explanations. Second, the defendants' joint motion for summary judgment must fail, because defendants have not asserted any authority that the results would be different on this record for Schallehn's state-law claim than they would be for her ADEA claim on which the court found summary judgment to be inappropriate.

On the more complicated issue raised by defendant Drennan's motion for summary judgment, the court concludes that certain individuals can indeed be held liable under the ADEA. In this conclusion, the court admittedly sides with the minority of authorities to conclude that supervisory employees, who are agents of an employer subject to ADEA liability, may be held individually liable for their own tortious conduct in violation of the ADEA. The court finds this result dictated by the plain meaning of the ADEA's definition of an employer as including "any agent," and has found no contrary expression of legislative intent. Indeed, this court's reading of the statute is supported by the

purposes of the ADEA to reach and remedy age discriminatory conduct. Further, the court, heeding the directive of the Supreme Court in *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408, concludes that application of agency principles to the question of the liability of supervisory employees leads to imposition of liability against individual supervisory employees in appropriate circumstances.

The court thus formulated a three-pronged analysis of the question of individual liability under the ADEA as follows: (1) the court, applying agency principles must determine whether the individual sought to be held liable is an agent of the employer; (2) applying the definition of "employer" found in the ADEA, 29 U.S.C. § 630(b), the court must determine whether the individual is an agent of an employer against whom ADEA liability may be asserted; and (3) the court must look both to the ADEA, for definitions of the tortious conduct it prohibits, and to agency principles to determine whether the agent, either alone or with the principal, has engaged in that tortious conduct, and thus may be held individually liable. Applying this three-pronged analysis to this case, the court concludes that there is at least a genuine issue of material fact as to whether or not Drennan may be held individually liable under the ADEA. Thus, Drennan's motion for summary judgment should also be denied.

**IT IS SO ORDERED.**